**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

ASSOCIATION OF AMERICAN UNIVERSITIES;

PRESIDENTS' ALLIANCE ON HIGHER EDUCATION AND IMMIGRATION;

ASSOCIATION OF INDEPENDENT COLLEGES AND UNIVERSITIES IN MASSACHUSETTS; and

NAFSA: ASSOCIATION OF INTERNATIONAL EDUCATORS,

Plaintiffs,

v.

U.S. DEPARTMENT OF HOMELAND SECURITY;

U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT;

U.S. DEPARTMENT OF JUSTICE;

MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security;

DAVID VENTURELLA, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement;

TODD BLANCHE, in his official capacity as Attorney General of the United States,

Defendants.

Case No. 26-cv-14520

**COMPLAINT**

1. In August 2026, on the eve of a new academic year and semester, the Department of Homeland Security ("DHS") abruptly changed a position that the federal government had held for more than thirty-five years and sharply restricted international students' access to internships

and other hands-on learning opportunities—all while simultaneously threatening college and university officials with criminal prosecution for approving enrollments consistent with the government's prior longstanding policy. This sudden change was issued with no substantive explanation, opportunity for comment, or even acknowledgement of the change, but with maximal impact on affected students and institutions. DHS's actions should be promptly stayed and enjoined given their many legal flaws and the ongoing harms they inflict on colleges and universities, their officials, and their students.

2. Practical learning opportunities like those at issue here are central to American higher education. Internships, practicums, cooperative education, and clinical and field placements allow students to apply classroom instruction to real-world problems, develop their skills through hands-on training, and gain the judgment and experience that classroom instruction alone cannot teach. These opportunities are vital in all academic fields, from computer science to the arts, public policy to business, and across all levels of higher education and all types of institutions, from large research universities to community colleges, technical colleges, and faith-based institutions. Practical training opportunities are especially vital in practice- and research-intensive fields such as public health, agricultural economics, biomedical and life sciences, and clinical disciplines where employers, licensing bodies, and advanced degree programs expect graduates to arrive with knowledge and skills that come only from hands-on experience. This training is integral to students' classroom experiences—because students better understand how they will use their classroom learning in their future jobs—and helps them explore, decide on, and prepare to enter their chosen fields.

3. For nearly eighty years, the federal government has recognized the importance of these opportunities and authorized international students' participation in such programs, subject

to certain parameters. But in August, without warning, DHS changed course and substantially restricted international students' participation in these real-world learning opportunities—and threatened colleges and universities and their employees with severe sanctions if they follow the government's own longstanding rule. This lawsuit challenges DHS's attempt to rewrite history, and to rewrite the law without appropriate procedure.

4. More specifically, international students on F-1 visas are permitted to access internships and other experiential learning opportunities approved by their schools through a program known as "curricular practical training," or CPT. By longstanding regulation established through notice-and-comment rulemaking, CPT is available to international students so long as the practical training opportunities they have selected are "directly related to the student's major area of study" and are "an integral part of an established curriculum." 8 C.F.R. § 214.2(f)(10)(i).

5. This case is about the latter phrase—"integral part of an established curriculum." For decades, the federal government has interpreted that phrase as allowing CPT whenever: (1) the training opportunity is taken for academic credit towards the student's degree; or (2) where not taken for academic credit, the training opportunity is mandatory for the student to complete their degree. But now, through two "Broadcast Messages" issued twelve days apart—on August 12 and August 24, 2026—DHS's Student and Exchange Visitor Program ("SEVP") has reversed course. Under the agency's novel and legally flawed interpretation, an internship or other opportunity qualifies for CPT only if it is mandatory for every student in the degree program, such that a student could not graduate without it. Elective training opportunities—even when taken for academic credit—do not qualify. By bureaucratic fiat, DHS has thus taken a requirement (mandatory for completion of degree) that previously applied only to one category of CPT (non-credit opportunities) and grafted it onto the other category (for-credit opportunities).

And it has done so in the face of regulatory history making clear that the government intended that requirement to apply only to non-credit opportunities.

6. DHS's new interpretation forecloses using CPT for valuable training opportunities for international students: for example, a psychology student shadowing a mental health provider to gain critical hands-on clinical experience; a law student interning in a judge's chambers during the semester, obtaining invaluable insight into the American legal system; or an art history major completing a cooperative education program at a museum, learning what museum operation and curatorial work look like first-hand. Each is an opportunity that may no longer be available under DHS's new interpretation of the governing regulation.

7. Remarkably, DHS's August Broadcast Messages (the "Broadcasts") do not even acknowledge that they announce a new interpretation of the CPT regulation. Instead, DHS styled the Broadcasts as mere "reminders" of existing obligations, as if its new standards had been the rule all along. The Broadcasts nowhere mention—much less explain a departure from—the decades of settled understanding, regulatory history, and agency guidance that squarely contradict them.

8. Worse still, DHS paired its unacknowledged reversal with threats to colleges, universities, and their officials. Specifically, the Broadcasts warn that any CPT authorization that is inconsistent with the new standards "may subject both the institution and individual" administrators to severe consequences. For institutions, that includes withdrawal of the institution's certification to enroll F-1 international students. For individuals, that includes "potential penalties for providing false information" under penalty of perjury. In other words, DHS threatened schools with severe institutional sanctions, and threatened individual school

officials with personal criminal liability, for conduct that conformed to the federal government's own longstanding position as recently as mid-August.

9. The Broadcasts are unlawful several times over. They are arbitrary and capricious under the Administrative Procedure Act ("APA") because they reverse decades of settled agency interpretation without acknowledging the change, without offering any reasoned explanation for it, and without considering the profound reliance interests of the institutions and students who built their degree programs and educational plans around the government's longstanding interpretation of the CPT regulation. Moreover, the Broadcasts fail to engage with any of the obvious reasons why for-credit experiential learning should be permitted even when it is not required of every student—because those opportunities are extraordinarily valuable for some students even if not mandatory for *all*, and because the Broadcasts' approach requires denying valuable opportunities to F-1 students even when those opportunities remain freely available to other students. The Broadcasts are also impermissibly retroactive, exposing institutions and officials to penalties for past conduct that fully complied with the government's position at the time. They are contrary to law because they contravene DHS's own thirty-five-year-old regulation. And they are procedurally invalid because they impose new, binding eligibility standards for CPT—backed by threats of enforcement—and are therefore legislative rules that could have been adopted, if at all, only through notice-and-comment rulemaking.

10. The Broadcasts are already inflicting serious and mounting harm. Students have borne the most immediate blow: institutions have been forced to halt CPT authorizations mid-stream, cancelling long-planned internships and other placements—including opportunities scheduled for this academic year that students secured months ago and, in many cases, cannot replace. For students nearing the end of their programs, these opportunities are lost forever; for

others, the training that their degree programs were designed around is now out of reach. The harm to the professionals who administer these programs is of a different and graver kind: Designated School Officials—career educators and advisers whom the government itself approves to administer SEVP (and other international programs) at their schools—now face threats of criminal liability for authorizations that complied fully with the government's own rules, forms, and training materials at the time they were made. Institutions of every kind—from the nation's leading research universities to community colleges, liberal arts colleges, and regional public institutions in every state—have had no choice but to comply immediately, given the government's threat to strip their ability to enroll international students at all. And these harms radiate outward: to organizations that host students on CPT seeking to provide them with valuable experiential learning opportunities, and to the broader public that benefits when the world's most talented students are educated, and gain practical experience, in the United States.

11. Action is needed now. Students have already lost critical internship and research opportunities for the current semester and institutions have had to scramble to determine how ongoing practicums, internships extended from last summer, and applications for future internships might be impacted. Colleges and universities, their students, and employers cannot plan for next semester without clarity that the longstanding legal regime will continue to govern.

12. Plaintiffs bring this action to restore the interpretation of the CPT regulation that governed for decades—which allows CPT whenever: (1) the training opportunity is taken for academic credit towards the student's degree; or (2) where not taken for academic credit, the training opportunity is mandatory for the student to complete their degree. To prevent further irreparable harm to Plaintiffs and their missions, their member institutions, and the officials and students at those institutions, the Court should hold the Broadcasts unlawful, stay their

implementation, vacate and set them aside, and preliminarily and permanently enjoin Defendants from implementing or enforcing their unlawful interpretation.

**JURISDICTION AND VENUE**

13. Plaintiffs bring this suit under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, and the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq*. Plaintiffs are persons adversely affected by final agency action promulgated by Defendants. 5 U.S.C. § 702.

14. This Court has jurisdiction under 28 U.S.C. § 1331 because this case arises under the laws of the United States.

15. Venue lies in this judicial district pursuant to 28 U.S.C. § 1391(e)(1) because this action seeks relief against federal agencies and officials acting in their official capacities, a substantial part of the events giving rise to the claims occurred in this district, one or more Plaintiffs reside in this district, and no real property is involved in the action.

**PARTIES**

16. Plaintiff Association of American Universities ("AAU") is a nonprofit association of 71 leading research universities in the United States and Canada, 69 of which are based in the United States. AAU is headquartered in Washington, D.C. AAU's members are public and private research universities dedicated to education, research, and innovation. AAU's mission includes advancing policies that sustain its members' ability to conduct research and education of the highest quality, and advocating on their behalf regarding federal regulation of higher education.

17. AAU brings this action on behalf of its member institutions. AAU's members have standing to sue in their own right. All of AAU's U.S.-based members are certified by SEVP to enroll international students on F-1 visas, and AAU's member institutions collectively authorize thousands of F-1 students to participate in CPT each year. For years, many of these members authorized CPT consistent with the governing CPT regulation, including for credit-based

opportunities that are integral to, but not required of all students in, a degree program. The Broadcasts force AAU's members to comply with DHS's new policy—and cease authorizing CPT for such opportunities—or risk losing their SEVP certification, along with other potential consequences.

18. The interests AAU seeks to protect are germane to its purpose of maintaining a strong system of academic research and education. Experiential learning is a critical component of educational advancement and research, and promoting member institutions' abilities to attract, enroll, and educate the best students—including students from around the world—is an important part of AAU's mission. Neither the claims asserted nor the relief requested requires the participation of individual members; AAU raises legal challenges to a discrete agency action and seeks only prospective declaratory and injunctive relief and vacatur of the challenged Broadcasts.

19. Plaintiff Presidents' Alliance on Higher Education and Immigration (the "Presidents' Alliance") is a nonprofit, nonpartisan association of American college and university leaders and their institutions, dedicated to increasing public understanding of how immigration policies and practices impact students, campuses and communities and supporting policies that create a welcoming environment for immigrant and international students on the campuses of member institutions. The Presidents' Alliance represents close to 600 public and private colleges and universities of all sizes and institutional types, including doctoral, master's level, baccalaureate, community college, and special focus institutions, from across the United States. Altogether, member institutions enroll over five million students and are located in forty-two states, D.C., and Puerto Rico. The Presidents' Alliance is headquartered in Washington, D.C.

20. This action is germane to the purposes of the Presidents' Alliance. The Presidents' Alliance's mission includes supporting policies that create a welcoming environment for

immigrant, undocumented, and international students on the campuses of member institutions. The Presidents' Alliance pursues its mission by, among other things, litigating on behalf of member institutions, including to challenge executive action related to student visas. *See, e.g.*, *Presidents' Alliance on Higher Educ. & Immigr. v. U.S. Dep't of Homeland Sec.*, No. 1:26-cv-13799 (D. Mass. filed Aug. 18, 2026) (Presidents' Alliance, along with other plaintiffs, challenging DHS's duration-of-status final rule). This action, challenging a DHS policy that will burden international students and other nonimmigrants studying and working at the Presidents' Alliance's member institutions, falls squarely within that mission.

21. Plaintiff Association of Independent Colleges and Universities in Massachusetts ("AICUM") is an organization established in 1967 by college and university presidents that represents 55 private colleges and universities across the Commonwealth of Massachusetts. It is the leading voice on public policy issues affecting independent higher education in Massachusetts. AICUM works closely with its member institutions to address state and federal legislative and regulatory issues, and to promote increased awareness of the significant contributions that colleges and universities make to the cultural, economic, and knowledge-based reputation of Massachusetts. AICUM advocates on behalf of its members on numerous issues, including protecting the interests of international students on its member campuses. AICUM is headquartered in Belmont, Massachusetts.

22. This action is germane to the mission of AICUM, which advocates on behalf of its members on numerous issues, including protecting the interests of international students on its member campuses—through litigation, when necessary. *See, e.g.*, *Presidents' Alliance on Higher Educ. & Immigr. v. Mullin*, Case No. 25-cv-11109 (D. Mass. filed Apr. 24, 2025) (involving both AICUM and the Presidents' Alliance as named plaintiffs).

23. Plaintiff NAFSA: Association of International Educators ("NAFSA") is the world's largest nonprofit association dedicated to international education and exchange. NAFSA serves the needs of more than 9,000 members and international educators worldwide at more than 2,300 institutions, in 170+ countries, the vast majority of whom are in the United States. NAFSA is headquartered in Washington, D.C., and has numerous members who are officials responsible for administering schools' SEVP functions, *i.e.*, Designated School Officials (DSOs) and Principal Designated School Officials (PDSOs). This action is likewise germane to NAFSA's purpose, given the importance of experiential learning to international education, and given the need to protect individual DSOs and PDSOs, many of whom are members of NAFSA, from unwarranted threats of liability.

24. Defendant United States Department of Homeland Security ("DHS") is the federal department within the executive branch with substantial responsibility for immigration policy and enforcement. DHS is an agency of the federal government within the meaning of 5 U.S.C. § 551(1). DHS is headquartered in Washington, D.C.

25. Defendant United States Immigration and Customs Enforcement ("ICE") is a component agency of DHS and has broad authority over the operation and enforcement of immigration laws. ICE is headquartered in Washington, D.C.

26. Defendant United States Department of Justice ("DOJ") is the federal department within the executive branch with responsibility for bringing criminal prosecutions, *see* 28 U.S.C. § 516, including any prosecutions for perjury, *see* 18 U.S.C. § 1621. DOJ is headquartered in Washington, D.C.

27. Defendant Markwayne Mullin is the Secretary of Homeland Security. In that capacity and through his agents, he has broad authority over the operation and enforcement of immigration laws. He is sued in his official capacity.

28. Defendant David Venturella is the Acting Director of ICE and has authority over ICE's operations, including SEVP. In that capacity and through his agents, he has broad authority over the operation and enforcement of immigration laws, including with respect to issuance of SEVP Broadcasts and enforcement of SEVP rules and regulations. He is sued in his official capacity.

29. Defendant Todd Blanche is the Attorney General of the United States. In that capacity and through his agents, he has authority over the prosecution and enforcement of federal criminal laws, including prosecutions for perjury. He is sued in his official capacity.

## BACKGROUND

### I. Regulatory Framework

#### A. SEVP Certification and Enrollment of F-1 Students

30. Under the Immigration and Nationality Act of 1952 ("INA"), international students are eligible to obtain F-1 nonimmigrant visas "for the purpose of pursuing . . . a course of study . . . at an established college, university, . . . or other academic institution . . . approved by" the federal government for the enrollment of such students. 8 U.S.C. § 1101(a)(15)(F)(i). Today, that approval takes the form of certification by SEVP, the ICE program office charged with administering the F-1 program on behalf of DHS. *See* 8 C.F.R. § 214.3.

31. SEVP certification is required for any institution that enrolls F-1 international students. A school that loses its SEVP certification immediately loses the ability to enroll new F-1 students. *See* 8 C.F.R. § 214.4(i). And because maintaining F-1 status requires pursuing a course of study at an approved educational institution, 8 U.S.C. § 1101(a)(15)(F), a school's

existing F-1 students would need to transfer if the school lost its certification. *See* 8 C.F.R. § 214.4(i) (describing consequences for schools and students when SEVP certification is withdrawn, including having any remaining student records terminated after a certain date).

32. To obtain SEVP certification, a school must petition the government, demonstrate that it is a bona fide educational institution with the facilities, personnel, and finances to provide the instruction it offers, and agree to comply with extensive recordkeeping, reporting, and other regulatory obligations. *See* 8 C.F.R. § 214.3(a)-(g). Certified schools must also periodically apply for recertification to maintain their eligibility. *Id.* § 214.3(h).

33. As a condition of SEVP certification, each school must nominate a Principal Designated School Official ("PDSO") and may nominate additional Designated School Officials ("DSOs")—regularly employed members of the school's administration whom the school authorizes, and the government approves, to administer the F-1 program. *See* 8 C.F.R. § 214.3(*l*).

34. DSOs (including the PDSO) perform numerous duties critical to the administration of the F-1 program. They issue the Form I-20, "Certificate of Eligibility for Nonimmigrant Student Status," that a prospective student must obtain from an SEVP-certified school before applying for an F-1 visa; they maintain and update each enrolled student's electronic record in the Student and Exchange Visitor Information System ("SEVIS"), the government database through which SEVP monitors schools and students; and they advise students on maintaining lawful F-1 status, including with respect to employment and practical training. *See* 8 C.F.R. §§ 214.2(f), 214.3(g), (*l*).

35. When a DSO issues a Form I-20 to a student, the DSO must certify under penalty of perjury that all information on the form is true and correct.[1] And when a school submits a

---

[1] DHS, Sample I-20 (Nov. 2025), https://studyinthestates.dhs.gov/assets/sample_formi20.pdf.

petition for SEVP certification or recertification, every DSO must attest that they intend to comply with all SEVP regulations. *See* 8 C.F.R. § 214.3(*l*)(3).

### B. Curricular Practical Training

36. DHS regulations have long permitted international students with F-1 status to enhance their classroom studies through experiential learning known as "[p]ractical training." The current regulations authorize two forms of practical training—Curricular Practical Training, and Optional Practical Training or "OPT." 8 C.F.R. § 214.2(f)(10).[2] The two forms of practical training are distinct, and OPT occurring before graduation (known as "pre-completion OPT") is not an adequate substitute (and is not intended to be a substitute) for students seeking to obtain experiential learning as part of their formal school curriculum through CPT.

37. In general, CPT allows international students to pursue specific experiential learning opportunities that are part of their degree's formal curriculum. CPT always occurs before graduation, must be "an integral part of an established curriculum," must be "directly related to the student's major area of study," and is "defined to be alternative work/study, internship, cooperative education or any other type of required internship or practicum that is offered by sponsoring employers through cooperative agreements with the school." 8 C.F.R. § 214.2(f)(10)(i).[3]

---

[2] The regulations also authorize STEM OPT, which is a 24-month extension of post-completion OPT that is available to certain students with degrees in STEM fields, *see* 8 C.F.R. § 214.2(f)(10)(ii)(C), but which is not relevant to the issues in this case.

[3] The reference to "work/study" in the CPT regulation is distinct from the federal work-study financial aid program, for which F-1 students (studying on nonimmigrant visas) are ineligible. *See* 20 U.S.C. § 1091(a)(5). In the CPT context, "work/study" refers to the type of cooperative education program where students both work and study in alternating or parallel semesters or other terms. *Cf. id.* § 1161n(b) (defining "cooperative education" to mean "the provision of alternating or parallel periods of academic study and public or private employment to give students work experiences related to their academic or occupational objectives and an opportunity to earn the funds necessary for continuing and completing their education").

38. Under the regulations, CPT must be authorized for each student on an individual basis by an SEVP-certified institution's DSO:

> A request for authorization for curricular practical training must be made to the DSO. A student may begin curricular practical training only after receiving their Form I-20 or successor form with the DSO endorsement. To grant authorization for a student to engage in curricular practical training, a DSO will update the student's record in SEVIS as being authorized for curricular practical training that is directly related to the student's major area of study. The DSO will indicate whether the training is full-time or part-time, the employer and location, and the employment start and end date. The DSO must sign, date, and return the Form I-20 or successor form to the student prior to the student's commencement of employment indicating that curricular practical training has been approved.

8 C.F.R. § 214.2(f)(10)(i). Based on those requirements, each student's CPT authorization is for a specific employer for a specific period of time.[4]

39. In short, CPT is designed for students to use while working on their degrees, in connection with specific opportunities that are part of the school's established curriculum for that degree and are pre-approved by the school.

40. Unlike CPT, OPT is not part of the established academic curriculum at all, and is not built into how schools design their academic programs. Instead, OPT is a method by which students can supplement or build on their area of study with outside opportunities that are not arranged or pre-approved by the school. And as discussed further below, OPT is not a realistic alternative for F-1 students who hope to pursue an experiential learning opportunity for course credit during a particular semester: students must obtain approval from their schools *and* the government to utilize OPT, which is a lengthy and unpredictable authorization process; they

---

[4] *See also F-1 Curricular Practical Training (CPT)*, DHS: Study in the States, https://studyinthestates.dhs.gov/sevis-help-hub/student-records/fm-student-employment/F-1-curricular-practical-training-cpt (last updated Aug. 24, 2026) ("Authorization is for one specific employer and for a specific period of time," and the "[s]tudent must secure the training opportunity before CPT can be authorized.").

cannot apply for pre-completion OPT until 90 days ahead of their requested start date; they must typically carry a full course load in addition to their OPT opportunity; and they must limit the time that they devote to OPT to 20 hours per week. Thus, OPT is not a substitute for, and is not intended to be a substitute for, curricular opportunities authorized under CPT.

41. Under the regulations, to engage in OPT individual students must not only secure their DSO's recommendation, *see* 8 C.F.R. § 214.2(f)(11)(ii), but must also apply for and obtain an Employment Authorization Document ("EAD") from U.S. Citizenship and Immigration Services ("USCIS"). *See id.* § 214.2(f)(11)(i). Pursuant to SEVP guidance, the earliest a student can apply for pre-completion OPT is 90 days before their requested start date with an organization.[5] Yet a student may not begin participating in OPT until USCIS approves the application and the student receives their EAD. *See id.* § 214.2(f)(10)(ii). And applying for and obtaining an EAD frequently takes several months, meaning many students at Plaintiffs' member institutions would be unable to secure approval for practical training programs in upcoming terms this academic year. Currently, according to USCIS's own data, the processing time for an F-1 student submitting an application for employment authorization (a Form I-765) is five months or longer.[6] Because the timing of the EAD approval is unpredictable and subject to government delays, it is more difficult for students to plan for OPT than CPT. For example, a student who has identified an opportunity with a fixed start date might lose a potential placement if an EAD is not issued by the start of the training program.

---

[5] SEVP, *Policy Guidance 1004-03 – Update to Optional Practical Training* § 5.5 (Apr. 23, 2010), https://www.ice.gov/doclib/sevis/pdf/opt_policy_guidance_042010.pdf.

[6] As of September 28, 2026, the USCIS "Case Processing Times" website indicates that only 80% of Form I-765 applications for employment authorization submitted by a qualified F-1 student are completed within five months. *See* https://egov.uscis.gov/processing-times.

42. Moreover, students engaged in OPT prior to graduation typically must carry a full course load alongside their OPT experience. Although students on CPT must also carry a full course load, that requirement is generally satisfied, at least in part, through the academic credits associated with the CPT experience itself, which allows the student to focus on that experience without needing to balance a full set of other courses. And because OPT is not associated with the school's curriculum and does not eliminate a student's obligation to enroll in a full course of study, *id.* § 214.2(f)(6), pre-completion OPT is limited to 20 hours per week while school is in session, *id.* § 214.2(f)(10)(ii)(A)(2).

43. Although OPT must also be "directly related to the student's major area of study," *id.* § 214.2(f)(10)(ii), OPT opportunities are not required to be associated with the school's formal curriculum. So, although a DSO must recommend a student for OPT, the student does not have to secure a specific training opportunity before the DSO can recommend the student for OPT, and the school does not pre-approve the student's specific employer or opportunity. *See* 8 C.F.R. § 214.2(f)(11).

## II. Regulatory History

44. The regulations governing CPT have never limited internships or similar opportunities only to those that are mandatory for everyone pursuing a degree. From 1947 until 1964, the regulations simply authorized "practical training," without requiring that such opportunities be mandatory in any way. In their current form, the regulatory text recognizes two pathways for opportunities to be eligible for CPT: (1) the student receives academic credit for the opportunity, regardless of whether it is mandatory or elective; or (2) the student does *not* receive academic credit but the training is mandatory for the student's degree. Contrary to the Broadcasts' stated position, only the second pathway is limited to experiences mandatory for completion of a

degree; the regulatory history makes clear that training opportunities that receive academic credit qualify for CPT even when they are elective.

45. The rationale for this framework is that different students in the same degree program may have different goals; schools recognize that, and until recently, the government did, as well. For many students, experiential learning is a critical component of their overall education, even if other students in the same degree program have a different focus and do not wish to pursue practical training opportunities. Thus, many academic programs make internships and other hands-on learning opportunities available to students, without making such opportunities mandatory for *all* students. Under the Broadcasts' interpretation, however, F-1 students would be permitted to engage in CPT only when the training opportunity is *required* for their degree—placing them at an educational disadvantage compared to their peers (who remain eligible to enroll in such elective courses without restriction). The regulations do not require such an illogical approach, and instead have allowed international students to partake in for-credit experiential learning from the outset.

**A. Early Practical Training Regulations**

46. The federal government has authorized international students at U.S. colleges and universities to take part in "practical training" programs for nearly eighty years, even before what is currently known as CPT was established. Regardless of how the federal government has categorized these opportunities—whether as part of a single umbrella authorization for "practical training" generally or, later, through a separate authorization for "curricular practical training" specifically—at no point, prior to the Broadcasts, has the federal government limited such opportunities to practical training programs that are mandatory degree requirements.

47. The Immigration and Naturalization Service ("INS") established the first "practical training" program by regulation in 1947. 12 Fed. Reg. 5355, 5357 (Aug. 7, 1947). International students were generally barred under the 1947 regulation from paid employment in the United States. *Id.* at 5357. But the regulation empowered regional INS directors to authorize an international student to engage in "employment for practical training" that was "required *or recommended* by the school" for an initial period of six months, extendable by up to an additional year. *Id.* (emphasis added). From the outset, then, the federal government authorized practical training even when the opportunities were not mandatory for a particular degree.

48. The government reaffirmed its commitment to practical training soon after Congress established a comprehensive framework for immigration law in the INA. As part of the INA, Congress created the F-1 visa, *see* 8 U.S.C. § 1101(a)(15)(F)(i), and in regulations, the INS again authorized agency officials to approve practical training for students with F-1 visas that was "required *or recommended*" by their schools. 18 Fed. Reg. 3526, 3529 (June 19, 1953) (emphasis added).

49. In 1964, the INS expanded on the general authorization for "practical training" opportunities, and created a separate process for authorizing work/study courses: "A student enrolled in a college or university having alternate work-study courses as a part of its regular prescribed curriculum may participate in such courses without obtaining a change of [nonimmigrant] status and without filing an application for permission to accept employment; however, such periods of actual employment shall be considered as practical training." 29 Fed. Reg. 13,241, 13,242 (Sept. 24, 1964); *accord* 43 Fed. Reg. 54,618, 54,621 (Nov. 22, 1978). In other words, an international student could take these "alternate work-study," *i.e.*, practical training, courses so long as the courses were a part of the relevant institution's regular curriculum.

50. The federal government used the term "curricular practical training" in regulations for the first time in 1987, encompassing "alternate work/study" courses as well as other opportunities. 52 Fed. Reg. 13,223, 13,225, 13,228 (Apr. 22, 1987). Specifically, in addition to general "practical training," INS regulations provided: "An F-1 student enrolled in [an institution of higher education] having a curricular practical training program (such as alternate work/study, internship, or cooperative education) as part of the regular curriculum may participate in the program without obtaining a change of nonimmigrant status." *Id.* at 13,228.

51. From the very beginning of CPT, then, an opportunity was eligible as long as it was "part of the regular curriculum." *Id.* And the INS confirmed as much in guidance implementing the 1987 regulation. The guidance explained that "[c]urricular practical training is an integral part of an academic program which is designed to prepare students for a career by supplementing theoretical training with actual work experience." INS Operations Instruction 214.2(f).[7] That guidance stated expressly that an "elective internship that is not required for the attainment of the degree or diploma is considered curricular practical training." *Id.*

**B. The 1991 Rule Establishing CPT In Its Current Form**

52. Soon afterwards, in 1991, the INS issued the regulation that still governs CPT today. Based on the history of that rulemaking, the phrase "integral part of an established curriculum" has always included opportunities for which a student receives academic credit, regardless of whether the relevant opportunity is mandatory—it is only *non-credit* opportunities that must be mandatory for the degree to qualify as CPT. That understanding of the regulation,

---

[7] Reprinted in 16 Charles Gordon et al., *Immigration Law and Procedure*, INS (Former Agency) Sources, OI 214.2 (rev. ed.) (available on LexisNexis).

codified in the final rule itself, is contrary to the Broadcasts' newly announced policy that even for-credit opportunities must be mandatory for all students in a degree program.

53. As discussed more fully below, the proposed rule set out the phrase "integral part of an established curriculum" to mean opportunities "for which students are awarded academic credits." 56 Fed. Reg. 27,211, 27,212, 27,215 (June 13, 1991). Thus, the regulation has always recognized that an opportunity accompanied by academic credit is properly considered an "integral part of an established curriculum." *Id.* at 27,215. When commenters argued that this definition was too narrow—because it excluded internships that were mandatory for students to complete their degrees but were not accompanied by academic credit, such as in hospitality or teaching programs—the agency added new regulatory text to ensure that CPT's definition would *also* encompass such mandatory, non-credit opportunities. Thus, the final 1991 rule created two pathways to CPT: either through a for-credit practical training opportunity, or through a non-credit practical training opportunity that was mandatory for the completion of a student's degree program. Each pathway captured practical training that a school deemed integral to its established curriculum—either because it gave students credit toward the completion of their degree, or because it deemed that non-credit training mandatory for their degree.

54. Initially, INS proposed recognizing only the first pathway for CPT, *i.e.*, deeming for-credit opportunities to be "integral" to the curriculum, based solely on students receiving credit for them. Specifically, INS's initial proposed rule stated that an F-1 student could be authorized "to participate in a curricular practical training program which is an integral part of an established curriculum, such as alternate work/study, internship, or cooperative education." 56 Fed. Reg. at 27,215. In its preamble to the proposed rule, the INS made clear that those

examples—*i.e.*, work/study, internships, and cooperative programs—qualify *because* they are training "for which students are awarded academic credits." *Id.* at 27,212.

55. During the comment period, commenters did not object to this first pathway for CPT rooted in academic credit, but instead expressed concern about not having an additional pathway for *non*-credit opportunities that were mandatory for completion of a degree. Specifically, commenters noted that "certain types of educational programs, such as hotel management, nursing, law, engineering, and teaching, routinely require their students to undertake non-credit internships." 56 Fed. Reg. 55,608, 55,611 (Oct. 29, 1991). In the final rule, the INS acknowledged that the proposed rule was focused on the first pathway—because it "defined curricular practical training as one where students are awarded academic credits"—but said it was "persuaded that required non-credit internships are part of the established curriculum" as well, and thus a "broader definition[]" including the second pathway was appropriate. *Id.* at 56,111.

56. Accordingly, the INS's final regulation established this second pathway to CPT eligibility, *i.e.*, "required noncredit internships or practicum." *Id.* But the final rule in no way deviated from the INS's recognition of the first pathway, that any opportunities "where students are awarded academic credits" are also considered an integral part of the established curriculum. *Id*. Indeed, the final rule expressly recognized that "elective" curricular practical training remained valid: "Under the final rule, an F-1 student may participate in any *required* curricular practical training as soon as school begins or in any *elective* curricular practical training after having been in status for nine months." *Id.* (emphases added).

57. To account for the additional category of non-credit mandatory internships, the final rule added a clause to the regulatory text clarifying that this category is a permissible use of

CPT: "An F-1 student may be authorized, by the DSO, to participate in a curricular practical training program which is an integral part of an established curriculum. Curricular practical training is defined to be alternative work/study, internship, cooperative education, or *any other type of required internship or practicum* which is offered by sponsoring employers through cooperative agreements with the school." 56 Fed. Reg. at 55,615 (emphasis added).

58. Guidance wired by INS headquarters to agency field offices on the day the final rule was published similarly stated that "[t]he final definition of curricular practical training includes required non-credit internships or practicum"—language describing an addition to the rule's coverage. INS Cable, IMMACT Wire #74, File CO 214P-C (Oct. 29, 1991), *reprinted in* 68 Interpreter Releases 1732, 1733 (Dec. 9, 1991) (available on Westlaw).

59. In relevant part, the final rule promulgated in 1991 remains the operative regulation governing CPT today. *See* 8 C.F.R. § 214.2(f)(10)(i).

60. In another provision of the same regulation (also promulgated in 1991), the use of similar language confirms that the phrase "integral part" does not equate to a mandatory degree requirement. Specifically, F-1 students are allowed to pursue on-campus employment "at an off-campus location that is educationally affiliated with the school," provided the employment is "an integral part of the student's educational program." 8 C.F.R. § 214.2(f)(9)(i). And per the 1991 rule, that authorization was intended to allow graduate students to work as research assistants for professors, including in situations where "professors have contract-based research grants which are not payable through the educational institutions." 56 Fed. Reg. at 55,609. Performing work on grants that "are not payable through the educational institutions" would generally not be a mandatory degree requirement for all students in a program, yet the regulation nonetheless considers such work, for some students, to be "an integral part of the student's educational

program." *Id.* Thus, the similar language in this regulation further refutes DHS's suggestion that "integral part of an established curriculum" in the CPT regulation means, as the Broadcasts claim, "required for the degree."

61. In short, the INS rulemaking history confirms that the 1991 rule recognized two categories of permissible CPT: opportunities for academic credit, whether mandatory or elective; and those not for credit, which must therefore be mandatory degree requirements. Through the Broadcasts, SEVP now seeks to retroactively add the "mandatory for a degree" requirement to the first category, contrary to the governing regulation.

**B. The Government's Longstanding Position on CPT**

62. Guidance issued after the 1991 rule—interpreting the regulatory language still in effect today—has consistently confirmed that elective for-credit practical training qualifies as CPT.

63. A January 1992 INS cable issued shortly after the 1991 rule went into effect confirmed that there are two distinct pathways for CPT eligibility. First, the cable stated that "[f]or credit [CPT] may be mandatory *or elective*," so long as the program is "listed in the school's course catalog with the assigned number of credits and name of the faculty member teaching the course clearly indicated" and "a description of the course with the course objectives clearly defined." INS Cable, File CO 243.69-C (Jan. 22, 1992), *reprinted in* 69 Interpreter Releases 187, 187 (Feb. 10, 1992) (available on Westlaw) (emphasis added). Second, the cable separately recognized "[n]on-credit internships or practicum which are required for graduation" as CPT. *Id.* at 188.

64. A May 1992 INS cable similarly underscored the two pathways to CPT: "When offered through course work, curricular training must be either for credit (*in the case of an elective*

*course*) or required." INS Cable, File CO 214f.2-C (May 4, 1992), *reprinted in* 69 Interpreter Releases 587, 587 (May 11, 1992) (available on Westlaw) (emphasis added).

65. An October 2013 SEVP newsletter embraced the same framework, stating—on behalf of both SEVP and the ICE office tasked with investigating fraud by international students, the Counterterrorism and Criminal Exploitation Unit ("CTCEU")—that CPT "must be part of a student's program of study, either required for completion *or optional, but for academic credit*."[8] And an SEVP training for DSOs that was available as early as 2014 through at least 2022 likewise stated: "In practical terms, 'integral part of an established curriculum' means an opportunity must be required by the curriculum or, *if not required, the student must receive credit for the training*."[9]

66. Other guidance has continued to authorize CPT without limiting it to mandatory programs required for a degree. Through at least March 2025, for instance, DHS's own student-facing guidance described CPT as training that must be an "integral part of your academic program and directly related to your major," and stated that a DSO could authorize CPT "if it meets program requirements," without specifying any additional constraints.[10]

---

[8] *CTCEU Update: Practical Training for F and M Students*, Homeland Security Investigations: SEVP Spotlight, at 3 (Oct. 2013), https://studyinthestates.dhs.gov/assets/sevp_spotlight_november_2013.pdf.

[9] SEVP, *Training for Designated School Officials* at 48, https://web.archive.org/web/20140823202052/http:/www.ice.gov/doclib/sevis/pdf/SEVP_DSO_Training.pdf (capture of Aug. 23, 2014); *accord* SEVP, *Training for Designated School Officials* at 48, https://web.archive.org/web/20220428165103/https://www.ice.gov/doclib/sevis/pdf/ SEVP_DSO_Training.pdf (capture of Apr. 28, 2022); *see also Schools and Programs*, ICE, https://web.archive.org/web/20220428142310/https:/www.ice.gov/sevis/schools (capture of Apr. 28, 2022) (linking to the DSO training).

[10] *Students: Review this Employment Resource Roundup*, DHS: Study in the States (Mar. 31, 2025), https://studyinthestates.dhs.gov/2025/03/students-review-this-employment-resource-roundup.

67. Accordingly, from 1947 when practical training was first created, to 1987 when "curricular practical training" was first introduced, to 1991 when the current CPT regulation was promulgated, until August 2026, the federal government confirmed that CPT was not limited only to mandatory programs required for a degree. This longstanding interpretation has remained in effect for decades, up until SEVP's sudden issuance of its Broadcasts in August.

## III. SEVP's New Restrictive Interpretation of CPT

68. In August 2026, SEVP adopted a restrictive new interpretation of when CPT is permissible that departs from the federal government's decades-long approach and purports to be effective immediately. Specifically, the August 12 and August 24 Broadcasts ignore the prior regulations and guidance recognizing two distinct pathways for CPT eligibility—(1) training opportunities that receive academic credit, whether mandatory or elective, and (2) opportunities that do not receive credit but are mandatory. Instead, the Broadcasts take a requirement from the second pathway—that it be mandatory for a student's degree—and transplant it onto the first pathway, purporting to require that even for-credit training opportunities be mandatory for the degree.

69. The government thus effectively rewrote the relevant regulatory language, and did so without engaging in any process whatsoever—let alone notice-and-comment rulemaking—instead announcing the changes through two agency "Broadcast Message[s]" issued to PDSOs and DSOs.

70. Beyond narrowing the circumstances when CPT is authorized, the Broadcasts also represent a novel escalation in the federal government's enforcement approach—expressly threatening individual DSOs with criminal prosecution for CPT authorizations consistent with the government's own longstanding position, *i.e.*, for opportunities that earned course credit but

were not required of all students to obtain a degree. No prior broadcast message has threatened individual DSOs with prosecution based on their good-faith performance of their duties under longstanding SEVP regulations and guidance.

## A. The Broadcast Messages

### 1. The August 12 Broadcast

71. SEVP first announced its new, more restrictive interpretation of CPT in Broadcast Message 2608-01, issued on August 12 ("August 12 Broadcast," attached hereto as Ex. A).[11] The Broadcast purported to "remind[]" DSOs of their "responsibilities" and "[p]otential liability" regarding CPT authorizations. Ex. A at 1. But while styled as a "[r]eminder," the August 12 Broadcast in fact announced entirely new standards for CPT eligibility. *Id.*

72. Specifically, the August 12 Broadcast's new interpretation would eliminate CPT eligibility for any opportunities that are not mandatory for all students in a degree program, even though the current regulation imposes that requirement only for non-credit opportunities. Contrary to the text of the governing regulation and longstanding agency guidance, SEVP announced for the first time in the August 12 Broadcast that CPT must be mandatory for a student's degree—*i.e.*, something "without which, they would be unable to complete their degree." Ex. A at 1. And the August 12 Broadcast instructed DSOs that they should authorize CPT only "if its absence would make the attainment of a degree an impossibility and if the work associated with CPT is required for *all* students pursuing that degree." *Id.* at 2.

73. SEVP claimed in the August 12 Broadcast to have "observed a rise in CPT authorizations that do not meet regulatory requirements," and said it was "increasing its scrutiny of CPT approvals to ensure compliance with federal regulations." *Id.* at 1. But the August 12

---

[11] Also available at https://www.ice.gov/doclib/sevis/pdf/bcm260801.pdf.

Broadcast did not acknowledge that the standards it announced constituted a departure from prior agency guidance on CPT eligibility and the longstanding interpretation of the requirement that CPT be "an integral part of an established curriculum" as including any opportunities for which students receive academic credit. *Id.*

74. In "remind[ing]" DSOs of their "[p]otential liability," the August 12 Broadcast warned that CPT authorization inconsistent with the terms of the Broadcast "may subject both the institution and individual DSO[s] to administrative or legal consequences," including the "withdrawal of SEVP certification and potential penalties for providing false information or misrepresenting the nature of the training." *Id.* at 1-2. The August 12 Broadcast twice reminded DSOs that CPT authorizations, codified through updated Forms I-20, are made "under penalty of perjury." *Id.* at 1. And the August 12 Broadcast instructed DSOs to "[c]arefully review all CPT requests and your institution's current academic requirements across all fields of study" to ensure that they satisfy the newly announced standards. *Id.* at 2. In addition, the August 12 Broadcast directed institutions and "members of the public" to "report suspected [CPT-related] fraud" to a dedicated SEVP email address. *Id.*

**2. The August 24 Broadcast**

75. Roughly two weeks later, on August 24, 2026, SEVP doubled down and expanded on its new interpretation in Broadcast Message 2608-02 ("August 24 Broadcast," attached hereto as Ex. B).[12] The August 24 Broadcast "provide[d] additional information on how CPT operates" through a series of questions and answers. Ex. B at 1. Many of the questions and answers reaffirmed that opportunities for which students receive academic credit are no longer permissible unless mandatory for all students pursuing that degree. One of the Q&As announced that, in order

---

[12] Also available at https://www.ice.gov/doclib/sevis/pdf/bcm_260802.pdf.

for a training opportunity to constitute eligible CPT, "all students enrolled in the established curriculum must participate in and complete practical training." *Id.* at 2. Another Q&A announced that CPT cannot "be offered as a part of an elective course." *Id.* at 1-2. And another distinguished CPT from OPT on the ground that only OPT can be "optional." *Id.* at 2.

76. The Q&As likewise did not address any of the prior agency guidance that establishes that elective for-credit practical training qualifies as CPT. And the August 24 Broadcast did not acknowledge its departure from that longstanding position. Instead, the Q&As attempted to recast that longstanding, government-sanctioned practice as noncompliance.

77. The August 24 Broadcast seeks to justify its new, more restrictive interpretation by redefining the word "integral" within the CPT regulation. Specifically, the August 24 Broadcast adopted a new definition of "integral" as "essential to completeness"—a definition that does not appear in any CPT regulation or any prior CPT guidance. (The Broadcast linked to a Merriam-Webster.com definition as its source.) But the August 24 Broadcast did not justify the selection of that definition as compared to others, such as "integral" meaning "formed as a unit with another part"[13]—a definition that is plainly consistent with for-credit opportunities qualifying as an "integral part of an established curriculum." Moreover, even under the government's selected definition of "essential to completeness," the August 24 Broadcast does not explain why that definition requires training opportunities to be essential to *earning* a degree, as opposed to being essential to *the overall curriculum offered* in connection with that degree. In some schools' judgments, a psychology degree that does not offer any in-person clinical

---

[13] *Integral*, *Merriam-Webster.com*, https://www.merriam-webster.com/dictionary/integral (last visited Oct. 5, 2026).

opportunities may not be a complete educational program, even if those clinical opportunities are not formally required to earn the degree.

78. In addition, the August 24 Broadcast invoked the CPT regulation's reference to "any other type of *required* internship or practicum." Ex. B at 1. But it did not address the regulatory history or past agency guidance that establishes that the "required" part of the regulation was intended to capture mandatory *noncredit* opportunities. To the contrary, the Broadcast effectively rewrote the relevant regulatory language so that the "required" element applied to the full provision, describing CPT as "an integral *and required* part of an educational experience." *Id.* (emphasis added).

79. The August 24 Broadcast again threatened severe sanctions if DSOs and institutions did not adhere to the newly announced CPT requirements, stating that "[f]ailure to comply with SEVP regulations may result in an institution losing certification to enroll foreign students." *Id.*

**3. The Broadcasts are Final Agency Action**

80. The Broadcasts are written in mandatory and unqualified terms. They instruct DSOs that CPT "cannot be authorized … for experiences that are not required or otherwise formally recognized as part of the academic program," Ex. A at 1; that DSOs should authorize CPT only if its absence would make the attainment of a degree an "impossibility," *id.* at 2; and that "all students enrolled in the established curriculum must participate in and complete practical training," Ex. B at 2. Nothing in the Broadcasts is framed as tentative, interlocutory, or subject to further agency deliberation.

81. The Broadcasts were issued by or under the authority of DHS officials in SEVP with delegated responsibility for administering the F-1 program, and they were disseminated to SEVP-certified institutions nationwide, including through email to DSOs and on the ICE website.

82. SEVP's own conduct confirms that the standards announced in the Broadcasts represent the agency's settled position. Rather than qualify or withdraw the August 12 Broadcast, SEVP reaffirmed and elaborated on its new standards twelve days later in the August 24 Broadcast, resolving asserted questions about CPT eligibility in definitive question-and-answer form. Upon information and belief, DHS personnel have applied and are applying the Broadcasts' standards in reviewing CPT authorizations, SEVIS records, and other immigration-related actions.

83. Legal consequences flow directly from the Broadcasts. For institutions, including members of AAU, the Presidents' Alliance, and AICUM, the Broadcasts function as compliance standards enforceable against institutions through withdrawal of SEVP certification. *See* 8 C.F.R. § 214.4. For DSOs, many of whom are members of NAFSA, the Broadcasts alter what they must attest to in connection with CPT authorizations and threaten them with perjury investigations and enforcement actions for noncompliance with the Broadcasts' new interpretation, which includes CPT authorizations that are consistent with the governing regulation and the settled understanding of that regulation. Plaintiffs' member institutions and their DSOs thus face a choice between abandoning conduct the governing regulation authorizes—approving elective, for-credit practical training as CPT—or risking decertification, institutional penalties, and personal liability. That untenable choice underscores the Broadcasts' immediate, real-world effect.

84. As for students, the Broadcasts' standards will result in the denial or withdrawal of CPT authorizations that the governing regulation permits, and may result in being considered out-of-status for past CPT authorizations that failed to comply with the Broadcasts' new interpretation. Upon information and belief, since the Broadcasts were issued, DHS personnel

have begun inquiring about students' prior CPT experiences, and how they were integral to students' degree programs, when those F-1 students submit applications for new immigration benefits (*e.g.*, adjustment of status to a different visa category). It is thus clear that DHS already views the Broadcasts as establishing the governing standard, and that DHS intends to apply the Broadcasts retroactively even to CPT authorized before the Broadcasts' issuance.

85. The Broadcasts, individually and collectively, announce and implement a single new agency policy governing CPT eligibility—an announcement that marks the consummation of the agency's decisionmaking with respect to the standards it announces. The Broadcasts' status as final agency action is further highlighted by the ample harms they are already causing, as discussed in more detail below.

**B. The Broadcasts' Impact on Institutions, Administrators, and Students**

86. Plaintiffs' member institutions and their employees and students have already experienced significant harm as a result of the Broadcasts, and they will continue to experience these irreparable harms as long as the Broadcasts are in effect.

87. Should Plaintiffs' member institutions fail to comply with the Broadcasts' new interpretation of the CPT regulation, DHS has threatened to revoke their SEVP certification, preventing them from enrolling new F-1 students and forcing current F-1 students to transfer to other institutions. The loss of SEVP certification would be devastating to a member institution, given the importance of F-1 international students to the broader community at that institution.

88. Loss of SEVP certification would be particularly inappropriate and unlawful if that withdrawal were based on a CPT approval that complied with the regulatory framework in effect at the time of that approval, *i.e.*, that was approved prior to the Broadcasts' August announcement of DHS's new interpretation of the CPT regulation. Even if institutions succeed in maintaining

their SEVP certification, defending themselves in a DHS investigation would be costly, likely causing institutions to expend significant time, effort, and resources they will never recover.

89. Moreover, the Broadcasts threaten DSOs with perjury investigations and enforcement actions, even for CPT authorizations that are consistent with the governing regulation and the settled understanding of that regulation. Particularly for CPT authorizations that occurred prior to the Broadcasts, these authorizations were indisputably lawful under the then-operative standards the federal government had maintained for decades. The Broadcasts make these threats of liability express, warning of "potential penalties for providing false information or misrepresenting the nature of the training." Ex. A at 1-2. Far from being preliminary or proposed, the Broadcasts clearly indicate that DHS is looking for targets for enforcement of the new policy the Broadcasts announce. Thus, DSOs have a well-founded fear of being the target of an enforcement action, either administrative enforcement by SEVP such as withdrawing an individual's ability to serve as a DSO (thereby threatening their career), *see* 8 C.F.R. § 214.3(*l*)(2), or criminal enforcement by DOJ through prosecutions for perjury, false statement, or other charges.

90. The Broadcasts affect all of Plaintiffs' U.S.-based member institutions by prohibiting them from authorizing CPT opportunities that were previously available, *i.e.*, opportunities for which students are awarded academic credit even when the training is not a mandatory degree requirement. Many of Plaintiffs' member institutions—including, for example, Boston University, Clark University, Columbia University, Cornell University, Dartmouth College, Foothill-De Anza Community College District, Grinnell College, Michigan State University, Mount Holyoke College, University of Illinois Urbana-Champaign, University of Pennsylvania, Suffolk University, Tufts University, University of Wisconsin, Vanderbilt

University, and Washington University in St. Louis—have narrowed their CPT authorizations based on the Broadcasts.

91. The loss of these practical training opportunities is significant, as many CPT opportunities that are available for academic credit—but are not mandatory for a degree—represent valuable educational opportunities for students and important components of the educational experience offered by institutions.

92. These lost practical training opportunities are also irreplaceable. There is no guarantee that a practical training opportunity that is available one semester will continue to be available in a future semester. Additionally, for many students—especially those approaching the end of their degree programs—this lost opportunity to engage in CPT is unrecoverable. And many of these students have been planning to complete internships or other experiential learning for months, if not years.

93. It also may not be feasible or pedagogically sound for colleges and universities to make practical training a mandatory requirement for all students in those degree programs. There are many reasons why educators may choose to make experiential learning non-mandatory, even when it is critical for some students' education. For example, some students in a degree program may wish to pursue academic research that lends itself to the classroom, while other students in that same degree program may prioritize clinical opportunities that are better suited to practical training. Making practical training mandatory for all students in that degree program would not serve the broader educational objectives of either the institution or the student. Moreover, even when schools make experiential learning a core part of the curriculum—such as by requiring a capstone project for completion of a degree—the Broadcasts may prevent students from using CPT

to pursue those opportunities any time there is another option available to them that does not require practical training.

94. As discussed above, it is not a realistic alternative for F-1 students to pursue these experiential learning opportunities through pre-completion OPT: students engaged in OPT typically must carry a full course of study alongside their work; they must not only obtain school approval but also apply for and obtain an EAD; they cannot apply for OPT until 90 days before their requested start date, yet it frequently takes substantially longer than that to obtain an EAD, preventing students from pursuing practical training programs in upcoming terms this academic year; and the timing of the EAD approval process makes it more difficult to plan specific opportunities, especially if the student is seeking academic credit for those opportunities.

95. Furthermore, because time spent on pre-completion OPT is subtracted from the twelve months of OPT a student would otherwise have available, requiring students to use OPT for programs previously eligible for CPT will reduce international students' overall access to practical training both while they are enrolled at member institutions and in the year following the completion of their degrees.

96. If the Broadcasts remain in effect, fewer CPT and experiential learning opportunities will be available at Plaintiffs' member institutions. This will uniquely harm F-1 students, as these experiential learning opportunities will continue to remain available for other students, and it risks depressing international student enrollment by making study at U.S. institutions less attractive to such students.

97. Allowing the Broadcasts to remain in effect will upend significant reliance interests. Plaintiffs' member institutions and their students structured their affairs around the federal government's longstanding position regarding CPT eligibility. Member institutions built

curricula around that position; developed relationships with employers and other external organizations that host practical training; hired personnel to administer experiential learning programs; and held themselves out as institutions able to provide all of their students, including international students, with experiential learning opportunities. DSOs have long authorized CPT for students in reliance on the previously long-settled understanding of the CPT regulation's text. And F-1 students, in turn, researched and chose their institutions and degree programs with the understanding that they would be able to participate in practical training related to their degrees; applied for those opportunities; and paid tuition to the schools they reasonably expected to authorize CPT, in reliance on the government's own longstanding rules. All of these expectations are frustrated by the Broadcasts' new interpretation.

98. The Broadcasts have also chilled DSOs, including members of NAFSA, in the exercise of their professional judgment administering SEVP regulations. Because the Broadcasts are styled as "reminders" and threaten perjury and false-statement liability, DSOs reasonably fear that past authorizations—lawful when made—could now be the basis for enforcement, and some have grown reluctant to authorize even CPT they believe plainly satisfies the regulation. At least one DSO with more than twenty years in the field has considered resigning altogether.

99. The Broadcasts further inflict reputational harm on member institutions, many of which have marketed themselves to prospective students based on the availability of experiential learning. Admissions officers recruiting abroad are already fielding questions about whether that promise still holds. Current students report that they would have chosen to study in another country or at a different institution had they known experiential learning would be unavailable to them. Each recruiting cycle that passes under the Broadcasts' new interpretation erodes institutions' standing in a global market for talent.

100. Staying and setting aside the Broadcasts and enjoining DHS from enforcing the regulatory interpretation articulated in the Broadcasts would immediately remedy these harms. Member institutions would be able to resume authorizing CPT as they had prior to the Broadcasts, consistent with the regulation and its longstanding meaning.

101. Relief would also benefit the broader public. Thousands of international students take part in CPT annually—more than 130,000 were authorized for CPT in 2024.[14] Those placements enrich students' education and, in turn, give host organizations the benefit of the global perspectives and talents international students bring. The Broadcasts threaten to cut off international students from this broader community—for example, leaving a laboratory without a planned researcher, a marketing firm without an expected intern, and a church without a music director. Declaring the Broadcasts unlawful and restoring CPT to its full scope would benefit third parties and the public alike.

## CLAIMS FOR RELIEF

### COUNT I
### THE BROADCASTS ARE ARBITRARY & CAPRICIOUS UNDER THE APA, 5 U.S.C. § 706(2)(A)

102. Plaintiffs incorporate and reallege the foregoing paragraphs as though fully set forth herein.

103. The APA directs courts to "hold unlawful and set aside" final agency actions that are "arbitrary" and "capricious." 5 U.S.C. § 706(2)(A). Agency action that is not the product of reasoned decisionmaking is arbitrary and capricious. *See, e.g.*, *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). To satisfy the core requirement of

---

[14] Student and Exchange Visitor Program, U.S. Immigration and Customs Enforcement, *2024 SEVIS by the Numbers Report*, at 13, 15-16, https://www.ice.gov/doclib/sevis/btn/25_0605_2024-sevis-btn.pdf (June 5, 2025).

reasoned decisionmaking, an agency must "cogently explain why it has exercised its discretion in a given manner." *Id.* at 48-49.

104. An agency that changes position must, at a minimum, display awareness that it is changing position, supply a reasoned explanation for the change, and, where its prior policy has engendered serious reliance interests, provide a more detailed justification that takes those interests into account. *FDA v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 569-70 (2025); *Dep't Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 28-31 (2020); *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Agency action must also rest on "a 'rational connection between the facts found and the choice made,'" and an agency may not fail to consider "important aspect[s] of the problem" or rest its decision on a mischaracterization of the record before it. *State Farm*, 463 U.S. at 43 (citation omitted); *Regents*, 591 U.S. at 30.

105. The Broadcasts, and the policy they announce, constitute final agency action within the meaning of 5 U.S.C. § 704. Although styled as a "[r]eminder of [l]iability for DSOs," Ex. A at 1, the Broadcasts mark the consummation of Defendants' decision-making process by announcing definitive new standards regarding CPT eligibility. The Broadcasts speak in mandatory, definitive terms, and legal consequences flow from them: They require SEVP-certified institutions and their DSOs to apply the newly announced standards in assessing CPT requests or else face enforcement action for failure to comply, exposing both the institutions and their DSOs to potential liability.

106. The Broadcasts mark a sudden, unexplained reversal from the federal government's prior longstanding position that training opportunities for which students receive academic credit are eligible for CPT, even if they are not mandatory for everyone to obtain the degree.

107. The Broadcasts are also arbitrary and capricious because they fail to consider reliance interests, including Plaintiffs' members and their international students. *See, e.g.*, *Regents of the Univ. of Cal.*, 591 U.S. at 30-33. The Broadcasts do not acknowledge, assess, or weigh the reliance interests of institutions, DSOs, or students, nor do they make any effort to consider alternatives that would accommodate them.

108. In addition, the Broadcasts are arbitrary and capricious because they fail to consider important aspects of the issues regarding CPT eligibility. *See State Farm*, 463 U.S. at 43. In particular, the Broadcasts fail to address the costs of the change in position to institutions and students; fail to consider the absence of a workable alternative to CPT for many students; and fail to consider the reasons why established curricula may be designed to preserve optionality for students, including in the service of important educational objectives.

109. Accordingly, the Broadcasts should be held unlawful, set aside, and vacated as arbitrary-and-capricious agency action under 5 U.S.C. § 706(2)(A). Additionally, to remove the threat of enforcement action against Plaintiffs, their member institutions, and DSOs, Defendants should be enjoined from taking any enforcement action based on the interpretation of the CPT regulation set forth in the Broadcasts.

## COUNT II
## THE BROADCASTS ARE UNLAWFULLY RETROACTIVE, IN VIOLATION OF THE APA, 5 U.S.C. § 706(2)(A), (B), (C)

110. Plaintiffs incorporate and reallege the foregoing paragraphs as though fully set forth herein.

111. Agency action is arbitrary and capricious when an agency "attempts to punish conformity to [a prior] standard under a new standard subsequently adopted," because "the very notion of an ordered society, in which authoritatively established rules of conduct may fairly be

relied upon, must preclude its retroactive effect." *Retail, Wholesale & Dep't Store Union, AFL-CIO v. NLRB*, 466 F.2d 380, 391-92 (D.C. Cir. 1972). Indeed, "[e]lementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly[.]" *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994).

112. The Broadcasts are impermissibly retroactive, as they attach new legal consequences to conduct completed before their issuance.

113. Specifically, the August 12 Broadcast warned that failure to comply with the terms of the Broadcast could "subject both the institution and individual DSO[s] to administrative or legal consequences," including "withdrawal of SEVP certification and potential penalties for providing false information or misrepresenting the nature of the training." Ex. A at 1-2. And the Broadcast said SEVP was "increasing its scrutiny of CPT approvals" in light of an alleged "rise in [allegedly unlawful] CPT authorizations" that predated the Broadcast. *Id.* at 1. Similarly, the August 24 Broadcast warned that "[f]ailure to comply" with the terms of the Broadcast "may result in an institution losing certification to enroll foreign students." Ex. B at 1. And it again alleged that SEVP had "observed a rise" in unlawful authorizations. *Id.*

114. Neither Broadcast states that it applies only prospectively, and both are written in terms that apply on their face to CPT requests and authorizations predating issuance of the Broadcasts. The Broadcasts' retroactive intent is further confirmed by their being styled as "reminders," discussing the legal standards that purportedly governed conduct even prior to their issuance.

115. Upon information and belief, Defendants have applied and are applying the Broadcasts' standards in reviewing CPT authorizations, SEVIS records, adjudicating

immigration applications, and in other immigration-related actions, even as to CPT authorizations occurring prior to the Broadcasts' issuance.

116. Neither Broadcast identifies any express congressional authorization for retroactive rulemaking.

117. The Broadcasts' retroactivity is arbitrary and capricious. When an agency changes course, it "must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account"; "[i]t would be arbitrary and capricious to ignore such matters." *Regents*, 591 U.S. at 30 (internal quotation marks omitted). An agency that changes course without supplying a more detailed justification for why retroactive application is warranted acts arbitrarily. *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221-22 (2016); *Cath. Health Initiatives Iowa Corp. v. Sebelius*, 718 F.3d 914, 922 (D.C. Cir. 2013). Defendants gave no consideration to the retroactive effects of the Broadcasts; did not weigh the substantial reliance of institutions and students on the prior regime; did not identify any asserted interest in retroactive application; did not consider prospective-only application or other alternatives that would serve any legitimate agency interest without penalizing completed conduct; and articulated no justification for retroactive application.

118. The Broadcasts' retroactivity also deprives regulated parties of fair notice. The Broadcasts seek to impose serious consequences on DSOs and institutions of higher education based on a regulatory interpretation of which they had no notice, for which they had no time to prepare, and which contradicts the longstanding position of the federal government, as consistently communicated through agency guidance. Penalizing past conduct that conformed to the government's then-existing position constitutes unfair surprise and is contrary to law.

119. Even if the Broadcasts were otherwise lawful and announced a legitimate interpretation of the CPT regulation that could be applied prospectively (which they do not), the Broadcasts cannot be applied to conduct that occurred, or statuses and benefits conferred, before their issuance.

120. Accordingly, the Broadcasts are unlawful and must be set aside as impermissibly retroactive under 5 U.S.C. § 706(2). Additionally, to remove the threat of enforcement action against Plaintiffs, their member institutions, and DSOs, Defendants should be enjoined from taking any enforcement action based on the interpretation of the CPT regulation set forth in the Broadcasts with respect to conduct and approvals occurring before the Broadcasts' issuance.

121. In the alternative, and at minimum, the Broadcasts must be enjoined and set aside insofar as Defendants apply them retroactively.

**COUNT III**
**THE BROADCASTS ARE CONTRARY TO LAW**
**IN VIOLATION OF THE APA, 5 U.S.C. § 706(2)(A), (C)**

122. Plaintiffs incorporate and reallege the foregoing paragraphs as though fully set forth herein.

123. The APA directs courts to "hold unlawful and set aside" final agency action that is "not in accordance with law," 5 U.S.C. § 706(2)(A), or that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C).

124. An agency is bound by its own duly promulgated regulations. *See, e.g.*, *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 265-67 (1954); *Fort Stewart Schs. v. Fed. Lab. Rels. Auth.*, 495 U.S. 641, 654 (1990). An agency may not amend, rescind, or override a regulation through guidance documents; a regulation remains binding on the agency unless and until it is lawfully amended or repealed.

125. The Broadcasts announce CPT eligibility standards that conflict with the text, structure, and history of the governing regulation, 8 C.F.R. § 214.2(f)(10)(i).

126. Because the Broadcasts conflict with the governing regulation, they are not "in accordance with law." 5 U.S.C. § 706(2)(A). And because no statute authorizes Defendants to amend or override duly promulgated regulations through informal guidance documents, the Broadcasts are also "in excess of statutory jurisdiction, authority, or limitations." *Id.* § 706(2)(C).

127. Accordingly, the Broadcasts should be held unlawful, set aside, and vacated under 5 U.S.C. § 706(2)(A) and (C). Additionally, to remove the threat of enforcement action against Plaintiffs, their member institutions, and DSOs, Defendants should be enjoined from taking any enforcement action based on the interpretation of the CPT regulation set forth in the Broadcasts.

**COUNT IV**
**THE BROADCASTS ARE PROCEDURALLY INVALID,**
**IN VIOLATION OF THE APA, 5 U.S.C. § 706(2)(D)**

128. Plaintiffs incorporate and reallege the foregoing paragraphs as though fully set forth herein.

129. The APA directs courts to "hold unlawful and set aside" final agency actions that have been issued "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

130. The August Broadcasts set forth a legislative rule subject to the APA's notice-and-comment requirements under 5 U.S.C. § 553.

131. A legislative rule is an "agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4).

132. Though styled as a "reminder" to DSOs, the Broadcasts announce a legislative rule because they effectively amend the existing regulatory framework for CPT by establishing new, binding CPT eligibility standards.

133. Defendants did not publish a notice of proposed rulemaking for the Broadcasts in the Federal Register, did not provide the public any opportunity to comment, and did not invoke or establish good cause under 5 U.S.C. § 553(b)(4)(B).

134. Because the Broadcasts announce a legislative rule not promulgated through the notice-and-comment process, it was issued "without observance of procedure required by law" and should be held unlawful, set aside, and vacated under 5 U.S.C. § 706(2)(D). Additionally, to remove the threat of enforcement action against Plaintiffs, their member institutions, and DSOs, Defendants should be enjoined from taking any enforcement action based on the interpretation of the CPT regulation set forth in the Broadcasts.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor against Defendants on the claims set forth above, and that this Court:

a. Declare that the Broadcasts are arbitrary and capricious and otherwise contrary to law, and adopted without observance of procedure required by law;

b. Declare that retroactive application of the Broadcasts is unlawful;

c. Declare that, under the existing regulation, CPT is permissible if: (1) the training opportunity is taken for academic credit towards the student's degree; or (2) where not taken for academic credit, the training opportunity is mandatory for the student to complete their degree;

d. Stay the Broadcasts under 5 U.S.C. § 705;

e. Vacate and set aside the Broadcasts under 5 U.S.C. § 706(2);

e. Preliminarily and permanently enjoin Defendants from implementing, enforcing, or otherwise carrying out the Broadcasts' interpretation of the CPT regulation as to Plaintiffs and each of their members, employees, and students;

f. Preliminarily and permanently enjoin Defendants from applying the Broadcasts' interpretation of the CPT regulation retroactively with respect to conduct and approvals that occurred prior to the Broadcasts' issuance;

g. Order Defendants to rescind any adverse action already taken in reliance on the Broadcasts;

h. Order Defendants to withdraw the Broadcasts and to notify all SEVP-certified institutions that the Broadcasts are of no force or effect;

i. Award Plaintiffs reasonable attorneys' fees and costs, including under 28 U.S.C. § 2412; and

j. Award such further relief as the Court deems just and proper.

Dated: October 5, 2026

Respectfully submitted,

JENNER & BLOCK LLP

By: *<u>/s/ Shoba Pillay</u>*
Shoba Pillay, BBO No. 659739
353 North Clark Street
Chicago, IL 60654
Tel: (312) 222-9350
SPillay@jenner.com

Ishan K. Bhabha (*pro hac vice forthcoming*)
Lindsay C. Harrison (*pro hac vice forthcoming*)
Ian Heath Gershengorn (*pro hac vice forthcoming*)
Elizabeth Henthorne (*pro hac vice forthcoming*)
Anjali Motgi (*pro hac vice forthcoming*)
Daniel Schwei (*pro hac vice forthcoming*)
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
Tel: (202) 639-6000
IBhabha@jenner.com
LHarrison@jenner.com
IGershengorn@jenner.com
BHenthorne@jenner.com
AMotgi@jenner.com
DSchwei@jenner.com

*Attorneys for Plaintiffs*