**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ASSOCIATION OF AMERICAN UNIVERSITIES; PRESIDENTS' ALLIANCE ON HIGHER EDUCATION AND IMMIGRATION; ASSOCIATION OF INDEPENDENT COLLEGES AND UNIVERSITIES IN MASSACHUSETTS; and NAFSA: ASSOCIATION OF INTERNATIONAL EDUCATORS,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,<br><br>Defendants. | Case No. 1:26-cv-14520 |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION AND STAY OF AGENCY ACTION**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..... iii

INTRODUCTION ..... 1

BACKGROUND ..... 5

I. THE REGULATORY FRAMEWORK ..... 5

A. SEVP Certification and Designated School Officials ..... 5

B. Curricular and Optional Practical Training ..... 6

II. REGULATORY HISTORY ..... 8

A. Early Practical Training Regulations ..... 8

B. Establishment of CPT ..... 9

C. The Government's Longstanding Position on CPT ..... 10

III. THE BROADCASTS ..... 12

A. The August 12 Broadcast ..... 12

B. The August 24 Broadcast ..... 13

C. Impacts of the Broadcasts ..... 13

LEGAL STANDARD ..... 15

ARGUMENT ..... 15

I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS. ..... 15

A. The Broadcasts Are Final and Ripe for Review. ..... 16

B. The Broadcasts Are Arbitrary & Capricious (Count I). ..... 18

1. The Broadcasts depart from the federal government's longstanding position without acknowledgment or explanation. ..... 18

2. The Broadcasts ignore serious reliance interests. ..... 21

3. The Broadcasts fail to consider important aspects of the problem. ..... 24

4. The justifications provided in the Broadcasts do not justify the change. ....26

C. The Broadcasts Are Impermissibly Retroactive (Count II). ....27

D. The Broadcasts Contradict the Regulation (Count III). ....29

E. The Broadcasts Are Legislative Rules That Were Issued Without Notice-and-Comment Rulemaking (Count IV). ....36

III. PLAINTIFFS' MEMBERS WILL SUFFER IRREPARABLE HARM ABSENT INJUNCTIVE RELIEF. ....38

IV. THE EQUITIES AND THE PUBLIC INTEREST FAVOR PLAINTIFFS. ....42

V. THE COURT SHOULD STAY AND ENJOIN THE BROADCASTS AND THEIR POLICY. ....44

CONCLUSION ....45

## TABLE OF AUTHORITIES

**CASES**


*American Federation of Teachers v. Department of Education*, 779 F. Supp. 3d 584 (D. Md. 2025) ....................20

*Ass'n of American Universities v. Department of Defense*, 792 F. Supp. 3d 143 (D. Mass. 2025)....................15, 41, 42

*Ass'n of American Universities v. Department of Energy*, 789 F. Supp. 3d 118 (D. Mass. 2025)....................23, 42

*Ass'n of American Universities v. National Science Foundation*, 788 F. Supp. 3d 106 (D. Mass. 2025)....................22

*Azar v. Allina Health Services*, 587 U.S. 566 (2019) ....................36, 38

*Ballou v. General Electric Co*., 433 F.2d 109 (1st Cir. 1970) ....................31

*Bienkowski v. Northeastern University*, 285 F.3d 138 (1st Cir. 2002) ....................31

*Camel Hair & Cashmere Institute of America, Inc. v. Associated Dry Goods Corp.*, 799 F.2d 6 (1st Cir. 1986)....................16

*Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142 (2012) ....................28, 29, 35

*City & County of San Francisco v. Trump*, 783 F. Supp. 3d 1148 (N.D. Cal. 2025) ....................41

*Department of Education v. California*, 604 U.S. 650 (2025)....................43

*Department of Homeland Security v. Regents of the University of California*, 591 U.S. 1 (2020)....................21, 22, 27

*Doe v. Trump*, 157 F.4th 36 (1st Cir. 2025), *cert. denied*, No. 25-899, 2026 WL 1871309 (U.S. June 30, 2026) ....................41, 44

*Doe v. Trump*, 2026 WL 1170971 (D. Mass. Apr. 30, 2026) ....................22

*Does 1-6 v. Mills*, 16 F.4th 20 (1st Cir. 2021) ....................15

*Encino Motorcars, LLC v. Navarro*, 579 U.S. 211 (2016) ....................18, 21, 23,26, 27

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009)....................18, 20, 21, 22, 27, 29

*FDA v. Wages & White Lion Investments, L.L.C.*, 604 U.S. 542 (2025)....................18, 19, 20

*Harper v. Werfel*, 118 F.4th 100 (1st Cir. 2024), *cert. denied*, 145 S. Ct. 2867 (2025)....................16

*Housatonic River Initiative v. United States EPA*, 75 F.4th 248 (1st Cir. 2023)..........................15

*Integrity Staffing Solutions, Inc. v. Busk*, 574 U.S. 27 (2014) ...............................................30, 31

*Jette v. United of Omaha Life Insurance Co.*, 18 F.4th 18 (1st Cir. 2021)..................................35

*Kisor v. Wilkie*, 588 U.S. 558 (2019)...........................................................................34, 35

*Landgraf v. USI Film Products*, 511 U.S. 244 (1994)..........................................................27, 28

*Liu v. Noem*, 780 F. Supp. 3d 386 (D.N.H. 2025) .....................................................................39

*Lockhart v. United States*, 577 U.S. 347 (2016) .........................................................................33

*Massachusetts v. Department of Education*, 828 F. Supp. 3d 198 (D. Mass. 2026) .....................41

*Massachusetts v. National Institutes of Health*, 770 F. Supp. 3d 277 (D. Mass. 2025), *judgment entered*, 2025 WL 1063760 (D. Mass. Apr. 4, 2025), *aff'd*, 164 F.4th 1 (1st Cir. 2026).....................................................................................23, 29, 36

*Massachusetts v. United States Department of Agriculture*, 2026 WL 1815807 (D. Mass. June 24, 2026) .....................................................................................................23

*Massachusetts Fair Housing Center v. United States Department of Housing & Urban Development*, --- F. Supp. 3d ---, 2026 WL 2521944 (D. Mass. Aug. 26, 2026) ..........................................................................................................................45

*Monga v. National Endowment for the Arts*, 323 F. Supp. 3d 75 (D. Me. 2018)..........................39

*Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983)..............................................................17, 23

*National Education Ass'n v. United States Department of Education*, 779 F. Supp. 3d 149 (D.N.H. 2025) ............................................................................................16, 36

*New Hampshire Hospital Ass'n v. Azar*, 887 F.3d 62 (1st Cir. 2018)........................35, 36, 37, 38

*New York v. United States Department of Justice*, 804 F. Supp. 3d 294 (D.R.I. 2025)...........................................................................................................40, 41

*Nken v. Holder*, 556 U.S. 418 (2009) .......................................................................15, 42

*Ozturk v. Trump*, 819 F. Supp. 3d 45 (D. Mass. 2025)............................................................39

*Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92 (2015) ..............................................................35

*President & Fellows of Harvard College v. United States Department of Health & Human Services*, 798 F. Supp. 3d 77 (D. Mass.), *appeal docketed*, No. 25-2231 (1st Cir. Dec. 31, 2025)...........................................................................................16

*President & Fellows of Harvard College v. United States Department of Homeland Security*, 788 F. Supp. 3d 182 (D. Mass.), *appeal docketed*, No. 25-1627 (1st Cir. July 1, 2025) .......... 39-40

*Presidents' Alliance on Higher Education & Immigration v. United States Department of Homeland Security*, --- F. Supp. 3d ---, 2026 WL 2690098 (D. Mass. Sept. 14, 2026) .......... 44

*Presidents' Alliance on Higher Education & Immigration v. Noem*, 824 F. Supp. 3d 168 (D. Mass. 2026) .......... 16, 29

*Retail, Wholesale & Department Store Union v. NLRB*, 466 F.2d 380 (D.C. Cir. 1972) .......... 27

*Rosario-Urdaz v. Rivera-Hernandez*, 350 F.3d 219 (1st Cir. 2003) .......... 41

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12 (1st Cir. 1996) .......... 38, 41

*SEC v. Chenery Corp.*, 318 U.S. 80 (1943) .......... 24

*Somerville Public Schools v. McMahon*, 139 F.4th 63 (1st Cir. 2025) .......... 43

*Starlight Sugar, Inc. v. Soto*, 114 F.3d 330 (1st Cir. 1997) .......... 38

*Tapis International v. INS*, 94 F. Supp. 2d 172 (D. Mass. 2000) .......... 34

*Thompson v. Barr*, 959 F.3d 476 (1st Cir. 2020) .......... 18

*Trump v. CASA, Inc.*, 606 U.S. 831 (2025) .......... 44

*United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954), *superseded by statute as stated in Department of Homeland Security v. Thuraissigiam*, 591 U.S. 103 (2020) .......... 29

*United States Army Corps of Engineers v. Hawkes Co.*, 578 U.S. 590 (2016) .......... 17

*United States v. Hoyts Cinemas Corp.*, 380 F.3d 558 (1st Cir. 2004) .......... 30, 31

*Westfield High School L.I.F.E. Club v. City of Westfield*, 249 F. Supp. 2d 98 (D. Mass. 2003) .......... 45

*Whoop, Inc. v. Serinity Group*, 834 F. Supp. 3d 170 (D. Mass. 2026) .......... 14

**STATUTES**

5 U.S.C. § 553(b) .......... 35

5 U.S.C. § 553(c) .......... 35

5 U.S.C. § 705 ..... 5, 15, 44, 45

5 U.S.C. § 706(2)(A) ..... 15, 30, 35

5 U.S.C. § 706(2)(C) ..... 30, 35

8 U.S.C. § 1101(a)(15)(F) ..... 5, 8

20 U.S.C. § 1091(a)(5) ..... 8

**OTHER AUTHORITIES**

8 C.F.R. § 214.2(f) ..... 6

8 C.F.R. § 214.2(f)(6) ..... 7

8 C.F.R. § 214.2(f)(9)(i) ..... 34

8 C.F.R. § 214.2(f)(10) ..... 2, 6, 7, 10, 30, 33, 39

8 C.F.R. § 214.2(f)(11) ..... 7

8 C.F.R. § 214.3 ..... 5

8 C.F.R. § 214.3(g) ..... 6, 43

8 C.F.R. § 214.3(h) ..... 43

8 C.F.R. § 214.3(*l*) ..... 6

8 C.F.R. § 214.4(i) ..... 5, 6

12 Fed. Reg. 5355 (Aug. 7, 1947) ..... 8

18 Fed. Reg. 3526 (June 19, 1953) ..... 8

29 Fed. Reg. 13,241 (Sept. 24, 1964) ..... 8

52 Fed. Reg. 13,223 (Apr. 22, 1987) ..... 8

56 Fed. Reg. 27,211 (June 13, 1991) ..... 9, 19, 31

56 Fed. Reg. 55,608 (Oct. 29, 1991) ..... 9, 10, 19, 31, 32, 34

*CTCEU Update: Practical Training for F and M Students*, Homeland Security Investigations: SEVP Spotlight (Oct. 2013), https://studyinthestates.dhs.gov/assets/sevp_spotlight_ november_2013.pdf ..... 11

ICE, *Schools and Programs*, https://web.archive.org/web/20220428142310/ https:/www.ice.gov/sevis/schools (capture of Apr. 28, 2022) ....... 11

ICE, *SEVP Reminds US Schools That CPT, OPT Are Not Interchangeable* (July 3, 2019), https://www.ice.gov/news/releases/sevp-reminds-us-schools-cpt-opt-are-not-interchangeable ....... 19-20

INS Cable, File CO 243.69-C (Jan. 22, 1992), *reprinted in* 69 Interpreter Releases 187 (Feb. 10, 1992) ....... 10, 19, 32

INS Cable, File CO 214f.2-C (May 4, 1992), *reprinted in* 69 Interpreter Releases 587 (May 11, 1992) ....... 10, 32

INS Operations Instruction 214.2(f), *reprinted in* 16 Charles Gordon et al., *Immigration Law & Procedure*, INS (Former Agency) Sources, OI 214.2 (rev. ed.) (available on LexisNexis) ....... 8-9

*Integral*, *Merriam-Webster.com Dictionary*, https://www.merriam-webster.com/dictionary/integral (last visited Oct. 5, 2026) ....... 32-33

*Integral*, *Oxford English Dictionary*, https://www.oed.com/dictionary/integral_adj (last visited Oct. 5, 2026) ....... 30

Sample Form I-20, DHS, https://studyinthestates.dhs.gov/ assets/sample_formi20.pdf (last updated Nov. 30, 2025) ....... 6

Student and Exchange Visitor Program, U.S. Immigration and Customs Enforcement, *2024 SEVIS by the Numbers Report*, https://www.ice.gov/doclib/sevis/btn/25_0605_2024-sevis-btn.pdf (June 5, 2025) ....... 42

Student and Exchange Visitor Program, Policy Guidance 1004-03 – Update to Optional Practical Training (Apr. 23, 2010), https://www.ice.gov/doclib/sevis/pdf/opt_policy_guidance_042010.pdf ....... 7

Student and Exchange Visitor Program, *Training for Designated School Officials*, https://web.archive.org/web/20140823202052/http:/www.ice.gov/doclib/sevis/ pdf/ SEVP_DSO_Training.pdf (capture of Aug. 23, 2014) ....... 11, 19

Student and Exchange Visitor Program, *Training for Designated School Officials*, https://web.archive.org/web/20220428142310/https:/ www.ice.gov/sevis/schools (capture of Apr. 28, 2022) ....... 11

*Students: Review this Employment Resource Roundup*, DHS: Study in the States (Mar. 31, 2025), https://studyinthestates.dhs.gov/2025/03/students-review-this-employment-resource-roundup ....... 11

U.S. Citizenship and Immigration Services, *Case Processing Times*, https://egov.uscis.gov/processing-times (last visited Oct. 5, 2026)..........................................7

## INTRODUCTION

In August 2026, on the eve of a new academic year and semester, the Department of Homeland Security ("DHS") dramatically narrowed the rules that for more than thirty-five years have enabled international students to engage in experiential learning that is integral to their studies. The Department did so not by notice-and-comment rulemaking that acknowledged and explained the drastic revisions, but instead by a pair of "Broadcasts" that denied that any change had occurred, purporting to "remind" students and school administrators that conduct they had openly engaged in for more than three decades has in fact been unlawful all along. The impact was (as intended) dramatic and immediate. International students with experiential opportunities scheduled for the coming year had their plans upended—canceling pre-arranged internships, immediately losing access to laboratories necessary to carry out previously planned research, and withdrawing from other training opportunities midstream. Colleges and universities have had to reexamine degree programs on the fly. And school officials were threatened with criminal prosecution for authorizing experiential learning opportunities permitted by the federal government's longstanding rules. The Administrative Procedure Act ("APA") exists to prevent such arbitrary, capricious, and unlawful government action.

Student internships and other forms of experiential learning have long been an essential component of higher education in the United States. These opportunities—often called "practical training"—allow students to apply their classroom instruction in real-world professional settings: a law student interning in a judge's chambers during the semester, obtaining invaluable insight into the American legal system; an art history major completing a cooperative education program at a museum, learning what museum operation and curatorial work look like first-hand; a psychology student shadowing a mental health provider to gain critical hands-on clinical experience. Learning-by-doing training opportunities like these are deeply enmeshed in

educational curricula across U.S. colleges and universities. And for nearly eight decades, recognizing the importance of experiential learning, the federal government has invited international students—like all other students—to participate in practical training opportunities.

Since 1991, federal regulations have authorized college and university officials to approve practical training for international students that is "an integral part of an established curriculum." 8 C.F.R. § 214.2(f)(10)(i). In establishing this form of practical training—known as "curricular practical training," or CPT—the federal government made clear that a training opportunity qualifies as CPT if either: (1) students earn academic credit for it; or (2) if not taken for credit, the school requires it for the student's degree. And for thirty-five years, in cables, training materials, and other guidance, the government repeatedly confirmed that both of these pathways for CPT were permissible—that "for-credit curricular practical training may be *mandatory or elective*." Yet in August, DHS abruptly reversed course and announced that training qualifies as CPT only if it is mandatory for *every* student in a degree program—where, in the agency's telling, its absence "would make the attainment of a degree an impossibility." Training that is "elective" thus no longer qualifies as CPT, even if the student receives academic credit through a course that is part of a school's established curriculum.

In so doing, DHS dramatically narrowed the range of practical training opportunities available to international students: Institutions can authorize CPT for students such as future public health experts, art historians, and psychology majors only if their practical training is required of every single student in the relevant degree program. Because a single degree prepares students for many different careers, however, such training is often not mandatory for every student. For example, a psychology major headed for academia may not need or benefit from clinical internships that other psychologists might seek out. Similarly, a public health student who seeks

to study the spread of infectious diseases may not require the same external opportunities as a student seeking to work directly with at-risk populations. Institutions of higher education are aware of, and generally embrace, the broad array of careers that students in any particular degree program might pursue after graduation—and for that reason, they often do not make practicums, internships, or other experiential learning programs mandatory for *every student* obtaining that degree. The institutions, in other words, give students the flexibility to chart their own academic path tailored to their interests and career goals, as the regulations have long allowed.

DHS cavalierly tossed aside this longstanding and sensible approach, and it did so in a manner that entirely disregards process and maximizes impact. The agency announced its change to CPT eligibility standards through two unsigned Broadcast Messages (the "Broadcasts") issued to colleges and universities nationwide. Nowhere did the Broadcasts acknowledge that this policy is new; nowhere did they reconcile the agency's current position with decades of agency guidance and institutional understanding, or with thousands of student internships and other experiential learning that were previously authorized; and nowhere did they address the massive reliance interests of the students, schools, and school officials affected by the Broadcasts. Remarkably, the Broadcasts insisted that this policy has always been the rule. Worse still, the Broadcasts are backed with threats and consequences: Institutions that authorize CPT consistent with the government's longstanding interpretation risk "withdrawal of SEVP certification"—the credential every school needs to enroll any F-1 international student. Compl. Ex. A, Doc. No. 1-1, at 1-2 ("Ex. A"). The individual school officials who administer their F-1 student programs are warned of personal criminal liability for "providing false information"—that is, for approving CPT based on the rules that have governed for thirty-five years. Compl. Ex. B, Doc. No. 1-2, at 2 ("Ex. B"). And DHS appears to have begun requiring students who previously completed CPT to justify their practical

training under the Broadcasts' new CPT eligibility standards when applying for other immigration benefits.

In pulling the rug out from under institutions of higher education, their employees, and their international students, the Broadcasts thus violate basic tenets of administrative law, enshrined in the APA, in at least four different ways. *First*, the Broadcasts reverse the government's nearly four-decades-long position without acknowledging the change, without a reasoned explanation (or any explanation), and without a word about the reliance interests of institutions, their officials, and their students who built and approved curricula and educational plans on the prior rule. *Second*, the Broadcasts are impermissibly retroactive, recasting decades of government-sanctioned practice as unlawful and exposing schools, officials, and students to consequences for conduct that complied with the rules in effect when it occurred. *Third*, the Broadcasts contradict the governing regulation and decades of consistent administration confirming that for-credit training qualifies as CPT whether or not it is mandatory for all students in a degree program. And *fourth*, the Broadcasts are legislative rules in everything but name, adopted without the notice-and-comment procedures the APA requires.

The harm from the Broadcasts is immediate and compounding. Threatened with decertification and the potential total loss of international students on campus, colleges and universities have halted CPT authorizations mid-semester. Students, in turn, are losing unique training opportunities that may not be available later. And the school officials responsible for approving CPT requests face an impossible choice: abandon their routine responsibilities, or risk criminal prosecution for discharging them. These injuries are already occurring and growing over time. In particular, mid-semester CPT placements need decisions imminently, requests for

extensions of CPT come in and must be decided throughout the Fall semester, and Winter and Spring 2027 CPT processing is already underway.

Plaintiffs Association of American Universities, Presidents' Alliance on Higher Education and Immigration, Association of Independent Colleges and Universities in Massachusetts, and NAFSA: Association of International Educators therefore respectfully request that the Court preliminarily enjoin Defendants from implementing or enforcing the Broadcasts' interpretation of the CPT regulation and stay the Broadcasts under 5 U.S.C. § 705 pending judicial review. Plaintiffs face a strong likelihood of success on the merits of their APA claims, and their members—colleges and universities, as well as the officials who administer international programs—are suffering irreparable and mounting harm. The government, on the other hand, loses nothing from an order that preserves the interpretation it has applied for thirty-five years. The equities and the law thus favor restoring the decades-old rule for CPT—ensuring that international students can continue to engage in the practical training opportunities they have long been afforded by law.

## BACKGROUND

## I. THE REGULATORY FRAMEWORK

### A. SEVP Certification and Designated School Officials

International students may obtain F-1 visas to pursue "a course of study" at an institution "approved by" the federal government. 8 U.S.C. § 1101(a)(15)(F)(i). Approval takes the form of certification by DHS's Student and Exchange Visitor Program ("SEVP"), the U.S. Immigration and Customs Enforcement ("ICE") program office that administers the F-1 program. 8 C.F.R. § 214.3. SEVP certification is required of any institution that enrolls F-1 students. A school stripped of certification immediately loses the ability to enroll any new F-1 students. *See id.* § 214.4(i). And because maintaining F-1 status requires pursuing a course of study at an approved

educational institution, 8 U.S.C. § 1101(a)(15)(F), decertification likely requires the school's already-enrolled F-1 students to transfer. *See also* 8 C.F.R. § 214.4(i).

Certified schools administer the F-1 program through Designated School Officials ("DSOs")—school employees, nominated by the institution and approved by the government, who run the international student program on campus. 8 C.F.R. § 214.3(*l*). Among other functions, DSOs maintain each student's records in the Student and Exchange Visitor Information System ("SEVIS")—the database SEVP uses to track certified schools and their international students—and also advise students on maintaining status, including as to employment and practical training. 8 C.F.R. §§ 214.2(f), 214.3(g), (*l*). In addition, DSOs issue the Form I-20, "Certificate of Eligibility for Nonimmigrant Student Status," that a prospective student must obtain from an SEVP-certified school before applying for an F-1 visa. For every Form I-20, the issuing DSO must certify, under penalty of perjury, that its contents are true and correct. *See* Sample Form I-20, DHS, https://studyinthestates.dhs.gov/assets/sample_formi20.pdf (last updated Nov. 30, 2025).

**B. Curricular and Optional Practical Training**

Federal regulations currently authorize two forms of practical training for F-1 students: curricular practical training ("CPT") and optional practical training ("OPT"). 8 C.F.R. § 214.2(f)(10). CPT allows a student to pursue experiential learning that is part of the school's formal curriculum: it occurs before graduation, must be "directly related to the student's major area of study" and "an integral part of an established curriculum," and is authorized by the school's DSO for a specific employer, location, and time period. *Id.* § 214.2(f)(10)(i). CPT is thus school-governed from end to end: the school designs the curriculum, approves the specific practical training opportunity, and certifies the authorization in SEVIS and on a student's Form I-20.

Like CPT, OPT must be "directly related to the student's major area of study." 8 C.F.R. § 214.2(f)(10)(ii)(A). But unlike CPT, OPT need not be "integral to" an established curriculum—

in fact, OPT requires no connection to the school's established academic curriculum. OPT differs from CPT in significant ways: To engage in OPT, in addition to securing their DSO's recommendation, a student must also apply for and obtain an Employment Authorization Document ("EAD") from U.S. Citizenship and Immigration Services ("USCIS"). 8 C.F.R. § 214.2(f)(10)(ii)(A), (11). Pursuant to SEVP guidance, the earliest a student can apply for an EAD for pre-completion OPT (*i.e.*, an OPT experience prior to graduation) is 90 days before the student's requested start date with an organization.[1] Yet a student may not begin participating in OPT until they receive their EAD, *see* 8 C.F.R. § 214.2(f)(10)(ii)—a process that, according to the government's own data, frequently takes approximately five months.[2] In addition, because students generally do not receive academic credit for OPT, students engaged in pre-completion OPT must typically take a full course of study in addition to their practical training. *See* 8 C.F.R. § 214.2(f)(6).[3] And because OPT is not associated with the school's curriculum and does not eliminate a student's obligation to enroll in a full course of study, *id.* § 214.2(f)(6), pre-completion OPT is limited to 20 hours per week while school is in session, *id.* § 214.2(f)(10)(ii)(A)(2).

---

[1] SEVP, Policy Guidance 1004-03 – Update to Optional Practical Training (Apr. 23, 2010), https://www.ice.gov/doclib/sevis/pdf/opt_policy_guidance_042010.pdf.

[2] As of October 2, 2026, the USCIS *Case Processing Times* website indicates that only 80% of Form I-765 applications for employment authorization submitted by a qualified F-1 student are completed within five months. *See* https://egov.uscis.gov/processing-times (last visited Oct. 5, 2026).

[3] Although students on CPT must also carry a full course load, that requirement is generally satisfied, at least in part, through the academic credits associated with the CPT experience, which allows the student to focus on that experience without needing to balance a full set of other courses.

## II. REGULATORY HISTORY

### A. Early Practical Training Regulations

The federal government has permitted international students to take part in practical training since 1947, regardless of whether it was required of all students in a program. In that year, while otherwise generally barring international students from paid employment in the United States, the Immigration and Naturalization Service ("INS") authorized "employment for practical training" that was "required *or recommended* by the school." 12 Fed. Reg. 5355, 5357 (Aug. 7, 1947) (emphasis added). Nothing in that first practical training regulation conditioned eligibility on the training's being mandatory for any purpose, including for an academic degree.

The same approach survived the creation of the modern immigration system. After Congress established the F-1 visa in the Immigration and Nationality Act of 1952, *see* 8 U.S.C. § 1101(a)(15)(F)(i), the INS again authorized practical training that was "required *or recommended*" by the student's school. 18 Fed. Reg. 3526, 3529 (June 19, 1953) (emphasis added). And in 1964, the INS expanded on the general authorization for "practical training" by creating a separate authorization for "alternate work-study courses" offered "as a part of [a school's] regular prescribed curriculum." 29 Fed. Reg. 13,241, 13,242 (Sept. 24, 1964).[4]

The term "curricular practical training" entered the regulations in 1987 as a category of practical training that encompassed elective opportunities. In new regulations issued that year, the INS provided that an F-1 student at an institution "having a curricular practical training program (such as alternate work/study, internship, or cooperative education) as part of the regular

---

[4] The reference to "work-study" in this regulation (and the current CPT regulation) is distinct from the federal work-study financial aid program, for which F-1 students (studying on nonimmigrant visas) are ineligible. *See* 20 U.S.C. § 1091(a)(5). In the CPT context, "work-study" refers to the type of cooperative education program where students both work and study in alternating or parallel semesters or other terms.

curriculum may participate in the program without obtaining a change of nonimmigrant status." 52 Fed. Reg. 13,223, 13,228 (Apr. 22, 1987). Agency guidance implementing the 1987 rule stated expressly that an "elective internship that is not required for the attainment of the degree or diploma is considered curricular practical training." INS Operations Instruction 214.2(f), *reprinted in* 16 Charles Gordon et al., *Immigration Law & Procedure*, INS (Former Agency) Sources, OI 214.2 (rev. ed.) (available on LexisNexis). Consistent with the government's earlier regulations, the 1987 rule did not limit CPT to training that is mandatory for completion of a degree.

**B. Establishment of CPT**

When INS issued the regulation in 1991 that still governs CPT today, it established that training opportunities for which students receive academic credit qualify as CPT. INS's initial proposed rule stated that an F-1 student could be authorized "to participate in a curricular practical training program which is an integral part of an established curriculum, such as alternate work/study, internship, or cooperative education." 56 Fed. Reg. 27,211, 27,215 (June 13, 1991). And in its preamble to the proposed rule, the INS described the expressly enumerated examples of practical training—*i.e.*, work/study, internships, and cooperative programs—as practical training "for which students are awarded academic credits." *Id.* at 27,212.

Through the notice-and-comment process, INS confirmed that for-credit opportunities qualify as CPT regardless of whether they are mandatory. In response to the proposed rule, commenters expressed concern about limiting CPT to opportunities linked to academic credit because "certain types of educational programs, such as hotel management, nursing, law, engineering, and teaching, routinely require their students to undertake non-credit internships." 56 Fed. Reg. 55,608, 55,611 (Oct. 29, 1991). The INS agreed. It acknowledged that "[t]he proposed rule defined curricular practical training as one where students are awarded academic credits," declared itself "persuaded that required non-credit internships are part of the established

curriculum," and adopted a "broader definition[]." *Id.* The final rule accordingly recognized an additional pathway for practical training—"required noncredit internships or practicum"—as also eligible for CPT. *Id.* at 55,611. But the credit-based pathway for CPT, including the expressly enumerated examples of "alternate work/study, internship, or cooperative education," remained untouched. 56 Fed. Reg. at 27,215.

The preamble confirmed this dual-pathway reading. Describing the final rule's operation, the INS explained that "an F-1 student may participate in any *required* curricular practical training as soon as school begins *or* in any *elective* curricular practical training after having been in status for nine months." 56 Fed. Reg. at 55,611 (emphases added). The rule that described CPT as an "integral part of an established curriculum" thus also made clear that elective CPT—the very training at issue here—was permissible. And that 1991 regulation remains the operative regulation today. *See* 8 C.F.R. § 214.2(f)(10)(i).

**C. The Government's Longstanding Position on CPT**

In the decades since that final rule was promulgated, the government has repeatedly affirmed that elective for-credit practical training qualifies as CPT—starting with guidance issued soon after the 1991 rule. A January 1992 INS cable sent to agency field offices explained that "[f]or-credit curricular practical training may be *mandatory or elective*," so long as "[t]he training program [is] listed in the school's course catalog with the assigned number of credits and name of the faculty member teaching the course clearly indicated." INS Cable, File CO 243.69-C (Jan. 22, 1992), *reprinted in* 69 Interpreter Releases 187, 187 (Feb. 10, 1992) ("January 1992 INS Cable") (emphasis added). The cable separately recognized "[n]on-credit internships or practicum which are required for graduation" as CPT. *Id.* at 188. And a May 1992 INS cable likewise explained that "[w]hen offered through course work, curricular training must be *either for credit* (in the case of

an elective course) or *required*." INS Cable, File CO 214f.2-C (May 4, 1992), *reprinted in* 69 Interpreter Releases 587, 587 (May 11, 1992) ("May 1992 INS Cable") (emphases added).

The government's confirmation of its position on elective CPT continued over the years. For instance, an October 2013 newsletter issued on behalf of both SEVP and the ICE office tasked with investigating fraud by international students—the Counterterrorism and Criminal Exploitation Unit ("CTCEU")—stated that CPT "must be part of a student's program of study, either required for completion *or optional, but for academic credit*."[5] In training for DSOs that was available as early as 2014 through at least 2022, SEVP similarly instructed that "'integral part of an established curriculum' means an opportunity must be required by the curriculum or, *if not required, the student must receive credit for the training*" (emphasis added).[6] And through at least March 2025, DHS's own student-facing guidance described CPT as training that must be "an integral part of your academic program and directly related to your major," authorizable by a DSO "if it meets program requirements," without any suggestion that the training must be mandatory.[7]

---

[5] *CTCEU Update: Practical Training for F and M Students*, Homeland Security Investigations: SEVP Spotlight, at 3 (Oct. 2013), https://studyinthestates.dhs.gov/assets/sevp_spotlight_november_2013.pdf.

[6] SEVP, *Training for Designated School Officials* at 48 ("DSO Training"), https://web.archive.org/web/20140823202052/http:/www.ice.gov/doclib/sevis/pdf/SEVP_DSO_Training.pdf (capture of Aug. 23, 2014); *accord* SEVP, *Training for Designated School Officials* at 48, https://web.archive.org/web/20220428165103/https://www.ice.gov/doclib/sevis/pdf/SEVP_DSO_Training.pdf (capture of Apr. 28, 2022); *see also* ICE, *Schools and Programs*, https://web.archive.org/web/20220428142310/https:/www.ice.gov/sevis/schools (capture of Apr. 28, 2022) (linking to "SEVP Training for Designated School Officials").

[7] *Students: Review this Employment Resource Roundup*, DHS: Study in the States (Mar. 31, 2025), https://studyinthestates.dhs.gov/2025/03/students-review-this-employment-resource-roundup.

## III. THE BROADCASTS

### A. The August 12 Broadcast

On August 12, 2026, SEVP issued Broadcast Message 2608-01 ("August 12 Broadcast") to DSOs at SEVP-certified schools. *See* Ex. A. While the August 12 Broadcast was titled "Reminder of Liability for DSOs Regarding CPT Authorization," *id.* at 1, it announced a drastically more restrictive interpretation of CPT. Specifically, the August 12 Broadcast stated that CPT must be "a core and essential part of the student's studies, without which, they would be unable to complete their degree." *Id.* In addition, the August 12 Broadcast instructed DSOs to authorize CPT only "if its absence would make the attainment of a degree an impossibility and if the work associated with CPT is required for *all* students pursuing that degree." *Id.* at 2. In other words, "elective" CPT does not qualify, even if a student receives academic credit for the training.

The August 12 Broadcast also addressed enforcement of its standards. SEVP claimed in the August 12 Broadcast to have "observed a rise in CPT authorizations that do not meet regulatory requirements" and announced that it was accordingly "increasing its scrutiny of CPT approvals." *Id.* at 1. The August 12 Broadcast reminded DSOs that their certifications on Form I-20s are made "under penalty of perjury." *Id.* And it warned that noncompliant authorization "may subject both the institution and individual DSO[s] to administrative or legal consequences," including "withdrawal of SEVP certification and potential penalties for providing false information or misrepresenting the nature of the training." *Id.* at 1-2. The August 12 Broadcast directed institutions and individuals to report suspected violations to a dedicated SEVP fraud-reporting address. *Id*. at 2. And in a closing paragraph, it purported not to constitute "a rule or a final action by SEVP" and said it "may not be relied upon to create" enforceable rights. *Id.* at 2.

### B. The August 24 Broadcast

Twelve days later, SEVP issued Broadcast Message 2608-02 ("August 24 Broadcast"), providing "additional information" on CPT through a series of questions and answers. Ex. B at 1. The August 24 Broadcast confirmed SEVP's restrictive interpretation of CPT, stating that for a training to constitute eligible CPT, "all students enrolled in the established curriculum must participate in and complete practical training[.]" *Id.* at 2. Contradicting the position set forth in the 1991 rulemaking and subsequent agency guidance, the August 24 Broadcast expressly stated that CPT cannot "be offered as a part of an elective course[.]" *Id.* at 1-2. And it described CPT as "an integral *and required* part of an educational experience." *Id.* at 1 (emphasis added). As support, the August 24 Broadcast cited a single online dictionary definition of "integral" as "essential to completeness." *Id.* And it distinguished CPT from OPT on the ground that only OPT can be "optional." *Id.*

The August 24 Broadcast repeated the claim in the earlier broadcast that SEVP had identified a "rise" in unlawful CPT authorizations. *Id.* at 1-2. In addition, it said that SEVP had "discovered that some institutions have not required all students enrolled in the same established curriculum to participate in practical training," contrary to what the August 24 Broadcast alleged were "clear regulatory requirements." *Id.* at 2. And the August 24 Broadcast again warned that "[f]ailure to comply with SEVP regulations may result in an institution's losing certification to enroll foreign students." *Id.* at 1.

### C. Impacts of the Broadcasts

The Broadcasts took effect immediately, just as the fall semester of a new academic year was beginning. In direct response to the Broadcasts, many colleges and universities stopped authorizing CPT for for-credit elective opportunities; began reviewing curricula against the new interpretation of CPT; and adjusted their advising practices for international students. *See, e.g.*,

Columbia Decl. ¶¶ 6-7, Doc. No. 8-5 (Columbia "has had to deny authorization to over 120 international students for Fall CPT," and "revisit[ed] their Fall career guidance sessions"); WashU Decl. ¶ 11, Doc. No. 8-14 ("The Broadcasts have forced WashU academic programs to reevaluate existing curricula."); Cornell Decl. ¶ 16, Doc. No. 8-6 ("many programs are currently considering formalizing [practical training] experiences as mandatory degree requirements for all students"). Institutions have also rescinded some CPT authorizations for students with placements scheduled for the current academic year. *E.g.*, NAFSA Decl. ¶ 7, Doc. No. 8-4 (institutions have "rescinded previously authorized CPT for fall-term internships"); Grinnell Decl. ¶ 10, Doc. No. 8-9 (at least thirteen students lost Fall 2026 internships in finance, consulting, and information technology). DSOs have reported anxiety over performing their job functions, given the now-constant threat of prosecution that hangs over them. NAFSA Decl. ¶¶ 16-19 (DSO with over twenty years' experience "is considering resigning their position and leaving the field altogether"); Dartmouth Decl. ¶ 14, Doc. No. 8-7 (threats in Broadcasts have "a particularly chilling effect," as DSOs "cannot reasonably be expected to risk prosecution"); Vanderbilt Decl. ¶ 10, Doc. No. 8-13 ("The unprecedented tone of the Broadcasts has raised concern that CPT determinations could subject individual DSOs … to additional scrutiny, even where they are seeking to comply in good faith."). And DHS appears to have begun requiring students who previously completed CPT to justify their practical training under the Broadcasts' new CPT eligibility standards when applying for other immigration benefits. NAFSA Decl. ¶ 20.

Plaintiffs are member organizations that represent both institutions and individual DSOs who have been directly impacted by the Broadcasts. Plaintiff Association of American Universities ("AAU") represents 69 leading research universities in the United States. AAU Decl. ¶ 6, Doc. No. 8-1. Plaintiff Presidents' Alliance on Higher Education and Immigration ("PA") represents

close to 600 public and private colleges and universities of all sizes and institutional types, located in forty-two states, D.C., and Puerto Rico. PA Decl. ¶ 3, Doc. No. 8-2. Plaintiff Association of Independent Colleges and Universities in Massachusetts ("AICUM") represents 55 private colleges and universities across the Commonwealth of Massachusetts. AICUM Decl. ¶ 3, Doc. No. 8-3. And Plaintiff NAFSA: Association of International Educators ("NAFSA") serves the needs of more than 9,000 members and international educators worldwide—including individual DSOs—with the vast majority of its members located in the United States. NAFSA Decl. ¶¶ 2-3.

## LEGAL STANDARD

To obtain a preliminary injunction, the movant must show that "(1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction serves the public interest." *Whoop, Inc. v. Serinity Grp.*, 834 F. Supp. 3d 170, 176-77 (D. Mass. 2026) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). When the opposing parties are government entities or officials sued in their official capacities, the balancing of the equities and the analysis of the public interest "merge." *Does 1-6 v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). The same standard governs both a motion for a preliminary injunction and a motion for a stay under 5 U.S.C. § 705. *Ass'n of Am. Univs. v. Dep't of Def.*, 792 F. Supp. 3d 143, 164 (D. Mass. 2025) ("*AAU v. DOD*").

## ARGUMENT

### I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

The APA directs courts to "hold unlawful and set aside agency action" that is "arbitrary" or "capricious," "not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations," or issued "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C), (D). The Broadcasts constitute final agency action that is unlawful under the APA several

times over. *First*, they are arbitrary and capricious because they reverse decades of settled agency interpretation with no reasoned explanation. *Second*, they are impermissibly retroactive, exposing institutions and officials to penalties for past conduct that fully complied with the government's position at the time. *Third*, they are contrary to law because they contravene DHS's own thirty-five-year-old regulation governing CPT eligibility. And *fourth*, they are procedurally invalid because they impose new, binding eligibility standards for CPT and thus set forth a legislative rule, yet were adopted without notice-and-comment rulemaking.[8]

**A. The Broadcasts Are Final and Ripe for Review.**

Agency action is final and subject to review under the APA if it (1) "mark[s] the 'consummation' of the agency's decisionmaking process," rather than being "of a merely tentative or interlocutory nature," and (2) is action "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Harper v. Werfel*, 118 F.4th 100, 116 (1st Cir. 2024) (quoting *Bennett v. Spear*, 520 U.S. 154, 178 (1997)), *cert. denied*, 145 S. Ct. 2867 (2025). The Broadcasts satisfy those criteria. *First*, the Broadcasts themselves make clear that they mark the consummation of SEVP's decisionmaking process. Nothing in either Broadcast "indicates that it is a preliminary or temporary statement of [the agency]'s policy." *Presidents' Alliance on Higher*

[8] Each Plaintiff association has standing to bring this suit on behalf of its members. *See Housatonic River Initiative v. U.S. EPA*, 75 F.4th 248, 264-66 (1st Cir. 2023). *First*, because the Broadcasts regulate and injure institutions directly, the members of AAU, PA, and AICUM have standing to sue as entities. *See supra* pp. 11-14. The same is true of the DSO members of NAFSA, who are also directly regulated and an express target of the Broadcasts. NAFSA Decl. ¶¶ 14-20. *Second*, the interests at stake are germane to these associations' research and educational purposes, including supporting the enrollment and education of international students. AAU Decl. ¶ 5; PA Decl. ¶¶ 5, 7; AICUM Decl. ¶ 4; NAFSA Decl. ¶¶ 2-3. *Finally*, neither the claims asserted nor the relief requested requires participation of individual members—whether institutions or DSOs—in the suit, as Plaintiffs raise legal challenges to discrete agency action and seek only forward-looking relief. *See, e.g.*, *Camel Hair & Cashmere Inst. of Am., Inc. v. Associated Dry Goods Corp.*, 799 F.2d 6, 12 (1st Cir. 1986) ("Actions for declaratory, injunctive and other forms of prospective relief have generally been held particularly suited to group representation.").

*Educ. & Immigr. v. Noem*, 824 F. Supp. 3d 168, 199 (D. Mass. 2026). To the contrary, the language of the Broadcasts is declarative and mandatory, stating that DSOs "can only authorize CPT" when training meets the new standard, that CPT is available "[o]nly … if its absence would make the attainment of a degree an impossibility and if the work associated with CPT is required for *all* students pursuing that degree," and that "all students enrolled in the established curriculum must participate in and complete practical training." Ex. A at 1-2; Ex. B at 2. Documents that are "prescriptive and 'mandatory'" in this way mark an agency's completed decision. *President & Fellows of Harvard Coll. v. U.S. Dep't of Health & Hum. Servs.*, 798 F. Supp. 3d 77, 115-16 (D. Mass.) (citation omitted), *appeal docketed*, No. 25-2231 (1st Cir. Dec. 31, 2025).[9]

*Second*, the Broadcasts determine the legal rights and obligations of universities, colleges, and their employees by establishing new eligibility standards, while threatening "administrative or legal consequences" for failure to comply with their mandates. Ex. A at 1. The Broadcasts warn institutions that failure to comply with the restrictive CPT standards could result in their "losing certification to enroll foreign students." Ex. B at 1; *accord* Ex. A at 1-2. And they redefine what DSOs must attest to under penalty of perjury each time they endorse a Form I-20, threatening "potential penalties for providing false information or misrepresenting the nature of [practical] training." Ex. A at 1-2. Institutions need not "await enforcement proceedings" to challenge the Broadcasts, which pose an immediate enforcement risk. *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 600 (2016).

[9] While the August 12 Broadcast closes with boilerplate language disclaiming any status as final agency action, such language "is not conclusive on the issue" of finality. *Presidents' All.*, 824 F. Supp. 3d at 199 (ICE broadcast message); *accord Nat'l Educ. Ass'n v. U.S. Dep't of Educ.*, 779 F. Supp. 3d 149, 185 (D.N.H. 2025) (court "not bound by the 'boilerplate' label" the agency attaches).

### B. The Broadcasts Are Arbitrary & Capricious (Count I).

Agency action survives arbitrary-and-capricious review under the APA only if it is the product of reasoned decisionmaking. *See Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 48-49 (1983). The Broadcasts suffer from multiple fatal flaws and do not come close to meeting that standard. Most egregiously, they reverse decades of settled agency policy without so much as acknowledging the change or offering any explanation for it. In so doing, they fail to recognize (let alone address) the reliance interests of institutions and students who built their degree programs and educational plans around the government's longstanding prior interpretation. But even if the Broadcasts had recognized the drastic change in position, they would *still* be arbitrary and capricious—because they ignore important aspects of CPT eligibility, including the practical effect of foreclosing training opportunities for international students unless mandatory, and the reasons why flexibility can be important in designing curricula. Individually and collectively, these failures render the Broadcasts arbitrary and capricious.

#### 1. The Broadcasts depart from the federal government's longstanding position without acknowledgment or explanation.

A bedrock principle of the APA is that an agency may not change course without good reason. When agencies announce a new policy or position, they must explain why they are doing so, and why the change is justified notwithstanding the interests of the public and of regulated entities in the old policy—in other words, they must "provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). Where an agency's prior policy has governed for many years, engendering substantial reliance on that policy within a particular industry, the agency must have a particularly good reason to change course. At bottom, the APA forbids agencies from suddenly altering longstanding rights and obligations; "these [administrative law] principles orbit around the same basic concern: an agency should not mislead

regulated entities." *FDA v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 567 (2025).

But that is exactly what DHS did here: It upended nearly four decades of its own CPT policy—relied on by hundreds of institutions of higher education and tens of thousands of international students currently enrolled at those institutions—for no apparent reason. And rather than "display awareness that it [wa]s changing position," as the APA requires, *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009), DHS simply pretended its new interpretation had been the rule all along. Masquerading as "reminders," the Broadcasts purported merely to repeat existing requirements for CPT, despite establishing new ones. And because the agency chose not to admit it was changing position, it is perhaps not surprising that the Broadcasts do not "show that there are good reasons for the new policy," *id.*, or otherwise "confront the issue squarely and explain why the departure" from the agency's longstanding precedent "is reasonable." *Thompson v. Barr*, 959 F.3d 476, 484 (1st Cir. 2020) (citation omitted).

Here, there is no doubt that the "agency changed existing policy." *Wages & White Lion Invs.*, 604 U.S. at 569-70. When it established the governing regulation in 1991, the government made clear that for-credit practical training qualifies as CPT, regardless of whether it is required of all students to complete a degree. *See, e.g.*, 56 Fed. Reg. at 55,611; 56 Fed. Reg. at 27,212 (CPT encompasses training "for which students are awarded academic credits"). In addition to this pathway to CPT—an unambiguous feature of the CPT rulemaking in 1991—the government then added a second pathway for CPT: "required noncredit internships or practicum." 56 Fed. Reg. at 55,611. From the moment it was issued, then, the rule authorized these two pathways to CPT. The government reaffirmed that position repeatedly in the thirty-five years since, including through agency guidance documents and training materials. *See, e.g.*, January 1992 INS Cable, *supra* ("[f]or-credit [CPT] may be *mandatory or elective*" (emphasis added)); DSO Training, *supra*

("'integral part of an established curriculum' means an opportunity must be required by the curriculum or, *if not required, the student must receive credit for the training*" (emphasis added)); *see also supra* pp. 10-11. And regulated entities—institutions with students on F-1 visas who may be eligible for CPT—have always understood such opportunities to be eligible for CPT under the regulation. *See, e.g.*, AAU Decl. ¶ 12 (before the Broadcasts, for-credit practical training was understood to be CPT-eligible "regardless of whether that specific opportunity is a mandatory requirement of the student's degree program"); Wisconsin Decl. ¶ 10, Doc. No. 8-15 (DHS's "previously consistent guidance" was that training qualifies as CPT if it satisfies a "graduation requirement" or results in "academic credit [for] the student"); UPenn Decl. ¶ 4, Doc. No. 8-12 (79.2% of CPT authorizations for the 2026 academic year "were course-credit based but not degree requirements").[10]

Nor is there any doubt that the agency failed to "'display awareness that it *is* changing position' and offer 'good reasons for the new policy[.]'" *Wages & White Lion Invs.*, 604 U.S. at 570 (citing *Fox Television Stations*, 556 U.S. at 515). The Broadcasts fail to acknowledge—and indeed deny—the change in policy that they accomplish. The August 12 Broadcast purported to "remind[]" DSOs of established "responsibilities," Ex. A at 1, and the August 24 Broadcast asserted that "clear regulatory requirements" and "prior broadcasts messages" have always imposed the Broadcasts' newly minted standard, Ex. B at 2. The Broadcasts never mentioned the 1991 rulemaking history, the preamble to the final 1991 rule, or the subsequent agency guidance

---

[10] While the August 24 Broadcast claimed support for its new interpretation in "[p]rior broadcast messages," Ex. B at 2, the only document it linked to is a 2019 ICE press release. *See* ICE, *SEVP Reminds US Schools That CPT, OPT Are Not Interchangeable* (July 3, 2019), https://www.ice.gov/news/releases/sevp-reminds-us-schools-cpt-opt-are-not-interchangeable. But that lone document was not formal guidance and did not purport to offer a definitive statement regarding CPT eligibility, but instead focused generally on the differences between CPT and OPT.

that have long made clear that elective, for-credit practical training qualifies as CPT, let alone tried to reconcile the standards they announced with those prior agency pronouncements. Instead of "forthrightly acknowledg[ing] that [the Broadcasts] ha[d] broken new ground," *Fox Television Stations*, 556 U.S. at 517, the Broadcasts pretended the new eligibility standards that they announced have governed all along. An agency cannot discharge its duty to acknowledge a change in position by denying that one ever happened. *See, e.g.*, *Am. Fed'n of Tchrs. v. Dep't of Educ.*, 779 F. Supp. 3d 584, 597, 616-17 (D. Md. 2025) (though the Department of Education claimed its Dear Colleague Letter "merely reminded Title VI funding recipients of their obligation to comply with existing civil rights law," the government had in fact "changed its position by asserting that certain discussions of race constitute discriminatory practices").

**2. The Broadcasts ignore serious reliance interests.**

An agency that departs from prior policy faces a heightened obligation of reasoned decisionmaking when that policy has "engendered serious reliance interests." *Fox Television Stations*, 556 U.S. at 515. In those circumstances, an agency is required to "provide a *more detailed* justification [for the new policy] than what would suffice for a new policy created on a blank slate." *Id.* (emphasis added). The agency is "required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 33 (2020). And "a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Encino Motorcars*, 579 U.S. at 222 (citation omitted).

None of that happened here. For over thirty-five years, Plaintiffs' members have structured their affairs around the federal government's longstanding position regarding CPT eligibility. Based on that position, institutions designed flexible curricula that allowed students (including

international students) who could benefit from practical training the opportunity to do so, without requiring it of all students. *E.g.*, UIUC Decl. ¶ 16, Doc. No. 8-10 (programs "preserve flexibility because students within the same degree may pursue different career paths"); Wisconsin Decl. ¶ 16 ("Each UW University has exercised its academic judgment to permit both foreign and domestic students the flexibility to choose between practical training and other appropriate educational experiences[.]"). These same institutions developed relationships with external organizations that host practical training even where not mandatory; hired university personnel to administer robust experiential learning programs; and held themselves out as institutions able to provide all of their students, including international students, with the same kinds of experiential learning opportunities. *E.g.*, Vanderbilt Decl. ¶ 7 (describing the impact on "Vanderbilt University–New York City," where students "gain hands-on experience and learn from industry partners outside the Nashville area").

F-1 students, in turn, chose their institutions and degree programs with the understanding that they would be able to participate in practical training related to their degrees; applied for those opportunities; and paid tuition to the schools they expected to authorize CPT. *E.g.*, UIUC Decl. ¶ 27 (prospective international students "commonly evaluate whether a program will allow them to combine academic study with relevant professional experience"). Many of those students planned to use CPT placements to earn money to help them afford their tuition and fees, and some have already experienced financial hardship after losing eligibility for Fall 2026 placements. *E.g.*, Dartmouth Decl. ¶ 12 (students slated to begin mid-September internships faced "last-minute changes to enrollment and other key aspects of the students' lives, including financial support"). The government's prior position, in other words, engendered substantial reliance interests on the part of schools and students alike. *See, e.g.*, *Ass'n of Am. Univs. v. Nat'l Science Found.*, 788 F.

Supp. 3d 106, 138 (D. Mass. 2025) ("Plaintiffs and member universities ha[d] relied on NSF's longstanding [policy] … in making long-term financial commitments, hiring and compensating staff, building and maintaining facilities, and generally advancing their scientific agendas."); *Regents of the Univ. of Cal.*, 591 U.S. at 31 (DACA recipients "enrolled in degree programs, embarked on careers, [and] started businesses" in reliance on DACA).

Yet far from offering "a more detailed justification," *Fox Television Stations*, 556 U.S. at 515, the Broadcasts did not address any of these reliance interests. The Broadcasts did not acknowledge the ways in which colleges, universities, and their students have for many years planned around the government's position that for-credit elective courses are eligible for CPT, let alone evaluate or weigh those reliance interests against other interests that might be served by the new policy. And they did not make any effort to consider alternatives that would accommodate those reliance interests. *See Doe v. Trump*, 2026 WL 1170971, at *18 (D. Mass. Apr. 30, 2026) (policy was arbitrary and capricious where policy memoranda did not "indicate that [the agency] considered alternatives to" the policy announced in those documents).

Even if the government deemed any reliance interests in its prior policy insubstantial or unimportant, it would still need to provide a "reasoned explanation … for disregarding" those interests. *Encino Motorcars*, 579 U.S. at 222 (citation omitted). But nothing in the Broadcasts reflects *any* understanding that the new policy implicates reliance interests at all. *See, e.g.*, *Massachusetts v. U.S. Dep't of Agric.*, 2026 WL 1815807, at *22 (D. Mass. June 24, 2026) (finding APA violation because agency did "not argue that it even considered [plaintiffs'] reliance interests"); *Massachusetts v. Nat'l Institutes of Health*, 770 F. Supp. 3d 277, 308 (D. Mass. 2025) ("*NIH*"), *judgment entered*, 2025 WL 1063760 (D. Mass. Apr. 4, 2025), *aff'd*, 164 F.4th 1 (1st Cir. 2026) (policy arbitrary and capricious because agency "fail[ed] in its entirety to recognize or

consider the substantial reliance interests at issue"); *Ass'n of Am. Univs. v. Dep't of Energy*, 789 F. Supp. 3d 118, 141 (D. Mass. 2025) ("*AAU v. DOE*") ("lack of reasoned explanation is particularly troubling in light 'of decades of industry reliance on [agency's] prior policy'").

**3. The Broadcasts fail to consider important aspects of the problem.**

The Broadcasts contravene the APA in yet another way: They "entirely fail[] to consider" at least two "important aspect[s] of the problem." *State Farm*, 463 U.S. at 43.

*First*, the Broadcasts failed to consider that they will, as a practical matter, foreclose many international students from pursuing important training opportunities. By requiring that even for-credit opportunities now must be mandatory, the Broadcasts dramatically curtail the availability of CPT without addressing the real-world impact on international students or their institutions. Without obtaining authorization for CPT or OPT, international students typically cannot engage in employment-like activities such as internships or practicums. By narrowing what was previously the broader of the two pathways to CPT, DHS has made it more difficult—if not impossible—for international students to participate in training programs they previously could access, without regard to the impact on those students, their education, and the schools and curricula designed around the longstanding system. Yet it has done so with barely any explanation at all.

Nor does the availability of pre-completion OPT support the government's decision to narrow CPT or excuse the government's lack of explanation. While the August 24 Broadcast's FAQs purported to distinguish CPT from OPT, Ex. B at 1-2, the Broadcasts nowhere justified their decision to restrict CPT on the basis that OPT is an adequate alternative, so the government cannot now defend them on that ground. *See SEC v. Chenery Corp.*, 318 U.S. 80, 87-88 (1943). And even if the Broadcasts had relied on that justification, they never addressed or even acknowledged the features and function of OPT that make it an unrealistic substitute for most of the lost CPT

opportunities. *See supra* pp. 6-7. The process for obtaining the individually adjudicated EAD required for OPT generally takes months—yet students cannot apply for OPT until 90 days before their requested start date. That timeline makes it difficult, if not impossible, for students to apply for and commit to training opportunities—like internships and practicums—with fixed start dates. Cornell Decl. ¶ 20 (USCIS's stated five-month processing time "virtually guarantees that pre-completion OPT EADs will not be received in time to begin an internship"); *see also* Grinnell Decl. ¶ 14 (OPT's $470 filing fee, $1,780 premium-processing fee, potential biometrics travel from rural Iowa, and reduction of post-completion OPT make it "highly problematic" as a substitute). And because students typically must carry a full course of study alongside OPT, that will make OPT more burdensome for many than for-credit CPT. AAU Decl. ¶ 18. The 20-hour weekly cap on OPT can also disqualify time-intensive training opportunities. *E.g.*, MSU Decl. ¶ 7.1.4, Doc. No. 8-11. Because the Broadcasts never engage with any of this, the existence of OPT does not render the Broadcasts any less arbitrary and capricious.

*Second*, the Broadcasts fail to consider the reasons why flexibility may be important for students and schools in designing curricula. Schools often make experiential learning elective for pedagogical reasons—some students in a program may wish to pursue academic research suited to the classroom, while others wish to pursue patient-facing clinical placements or less theoretical research in industry placements. For instance, while a physics student interested in teaching might not have reason to engage in practical training, another physics student looking to enter the private sector might want experience with "hands-on-laboratory research." FHDA Decl. ¶¶ 11-12, Doc. No. 8-8; *see also, e.g.*, WashU Decl. ¶ 8.1 (some students may opt for a clinical-sciences track that requires an internship, while others may opt for a research track that does not); Cornell Decl. ¶ 15 (programs are "intentionally designed to provide students with flexibility to pursue different

educational pathways while achieving common learning objectives”). Narrowing the scope of eligible CPT to training that is mandatory for all students would force institutions to either impose training on students for whom it serves no educational purpose, or instead deny opportunities to international students who would benefit from that training. *See, e.g.*, UIUC Decl. ¶ 20 (programs could have “to impose unnecessary requirements on students pursuing research or other non-applied pathways,” or instead “deny international students access to established curricular opportunities that remain available to domestic students”); Wisconsin Decl. ¶ 28 (requiring practical training of a master’s student with prior professional experience “may be redundant and unnecessarily increase their time to degree”). The August 12 Broadcast itself conceded that “the school, not the U.S. government, defines what is and is not required to complete a degree.” Ex. A at 1. But the agency never considered what its new policy does to schools’ established curricula—or the ways it imposes costs on students as a result of those pedagogy-driven curricular designs.

#### 4. The justifications provided in the Broadcasts do not justify the change.

The only basis that the Broadcasts identified for issuing what they (incredibly) styled a “remind[er]” is an alleged “rise in CPT authorizations that do not meet regulatory requirements.” Ex. A at 1; *accord* Ex. B at 1. But to the extent the Broadcasts describe authorizations that were consistent with longstanding policy, that is circular: an agency cannot justify a change in policy merely by suggesting some impropriety in conduct that is *consistent with* its prior policy but fails to conform to the agency’s newly announced approach.

If DHS meant its cryptic comment to refer instead to authorizations that were *inconsistent* with the prior longstanding position, the agency fares no better. DHS made no effort to identify instances that failed to comply with its longstanding prior interpretation—*i.e.*, opportunities that were neither for-credit nor mandatory for a degree and therefore were not eligible for CPT under

either pathway recognized by the 1991 rule. And DHS never explained how such abuses of the CPT program will be easier to identify for enforcement or more likely to be deterred by narrowing one of the pathways of permissible CPT.

Regardless, this is all academic. The Broadcasts never connected the supposed "rise in CPT authorizations that do not meet regulatory requirements" to the new policy they announced. Ex. A at 1. The Broadcasts are thus arbitrary and capricious because "[w]hatever potential reasons the [agency] might have given," and whatever the merits of those reasons, "the agency in fact gave almost no reasons at all." *Encino Motorcars*, 579 U.S. at 224.

### C. The Broadcasts Are Impermissibly Retroactive (Count II).

"Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994). An agency may not "punish conformity to [a prior] standard under a new standard subsequently adopted." *Retail, Wholesale & Dep't Store Union v. NLRB*, 466 F.2d 380, 391 (D.C. Cir. 1972); *see also Landgraf*, 511 U.S. at 269-70 (provision retroactive where it "attaches new legal consequences to events completed before its enactment"). And because, as discussed, an agency changing course "must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account," *Regents of the Univ. of Cal.,* 591 U.S. at 30 (internal quotation marks and citation omitted), an agency that attaches new consequences to completed conduct without ever weighing the retroactive effects of doing so acts arbitrarily, *see id.*; *Fox Television Stations*, 556 U.S. at 515; *Encino Motorcars*, 579 U.S. at 222.

The Broadcasts here are impermissibly retroactive because they threaten to punish regulated parties for conduct that conformed to the government's announced position at the time of the conduct. The August 12 Broadcast was captioned as a "Reminder of Liability for DSOs Regarding CPT Authorization," Ex. A at 1, and was thus self-evidently framed as retroactive: a

"reminder" of supposedly pre-existing obligations. Indeed, the August 12 Broadcast suggested that past failure to comply with the new CPT eligibility standards could "subject both the institution and individual DSO[s] to administrative or legal consequences." *Id.* And the August 24 Broadcast was more explicit still, as it insisted that prior messages had already "reminded DSOs of the integral and required elements of CPT." Ex. B at 2. It reported that SEVP "has noted that some institutions have described CPT as if it is optional practical training and not integral, despite clear regulatory requirements." *Id.* And it stated that SEVP "has also discovered" that some institutions "have not required all students enrolled in the same established curriculum to participate." *Id.* Each finding discussed past conduct but condemned it under the Broadcasts' new standard. And neither document limited its application only to future requests.

The agency's conduct confirms the Broadcasts' retroactive effect: USCIS officials have reportedly begun scrutinizing past CPT authorizations under the Broadcasts' new standard when adjudicating immigration applications filed by international students. NAFSA Decl. ¶ 20 (USCIS issued Requests for Evidence about whether past CPT authorizations were consistent with the new interpretation); *see also* Wisconsin Decl. ¶ 34 (SEVP representative stated that retroactive application of the Broadcasts during adjudication of a future application was "always possible").

Those threats of retroactive application violate "[e]lementary considerations of fairness" that underlie the retroactivity doctrine. *Landgraf*, 511 U.S. at 265. The government has for thirty-five years adhered to the position that for-credit practical training qualifies as CPT, regardless of whether the training is required of all students to complete a degree. Schools, their employees, and their students have in turn structured their operations around that understanding of the law. *See supra* pp. 21-22. Yet now, without any "fair warning," *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 156 (2012) (citation omitted)—indeed without any warning whatsoever—the

government has threatened those very same parties with damaging and irreparable consequences for actions they took in conformity with that long-settled understanding. Individual DSOs—school employees responsible for overseeing the F-1 program on campus—are told that they could face *criminal liability* for having done their jobs in a way they were told was lawful at the time. Indeed, that very possibility has already chilled some DSOs in the performance of their normal workplace functions. NAFSA Decl. ¶¶ 16-19 (DSOs "are now reluctant to sign documents for fear of personal liability"); Dartmouth Decl. ¶ 14 (threat of personal liability has "significantly burden[ed] [DSOs'] … ability to advise students"). And institutions face not only a complete upending of CPT, but the prospect of SEVP decertification—meaning a complete loss of their ability to enroll any international students at all, *see supra* p. 5—all because they authorized practical training for their international students according to the government's own interpretation of its regulations.

Those results present "precisely the kind of 'unfair surprise' against which [the Supreme Court] ha[s] long warned," *Christopher*, 567 U.S. at 156 (citation omitted), and which the retroactivity doctrine exists to guard against. Even if SEVP could lawfully apply its new restrictive interpretation of the regulations going forward, it cannot apply that standard to authorizations previously made, certifications signed, and practical training completed while the government's original position governed. *See, e.g.*, *NIH*, 770 F. Supp. 3d at 316-18. Nor has the government even attempted to explain why retroactive application of its new CPT policy would be appropriate. The Court should accordingly enjoin Defendants from applying the Broadcasts—through decertification proceedings, personal-liability actions, benefit adjudications, perjury prosecutions, or otherwise—to conduct or CPT approvals occurring before the Broadcasts' issuance.

**D. The Broadcasts Contradict the Regulation (Count III).**

Duly promulgated regulations bind the agency that issued them. *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 265-67 (1954), *superseded by statute as stated in Dep't of*

*Homeland Sec. v. Thuraissigiam*, 591 U.S. 103 (2020); *see also Fox Television Stations*, 556 U.S. at 515 (an agency may not "simply disregard rules that are still on the books"). "An agency action … must be set aside as contrary to law when it is inconsistent with regulations." *Presidents' All.*, 824 F. Supp. 3d at 200 (quoting *New York v. Trump*, 811 F. Supp. 3d 215, 241 (D. Mass. 2025)). The Broadcasts announced an eligibility standard that the regulation's text, structure, drafting history, and thirty-five-year administration all refute. The agency has read the regulation to cover elective training since the day it promulgated the rule, and the regulation's text bears exactly that meaning. The Broadcasts must therefore be set aside as "not in accordance with law," 5 U.S.C. § 706(2)(A), and "in excess of statutory jurisdiction, authority, or limitations," *id.* § 706(2)(C).

Start with the text. Section 214.2(f)(10)(i) authorizes a DSO to approve a student's participation in training that is "an integral part of an established curriculum." Participation in elective internships and similar training for academic credit fits that definition hand in glove.

"Integral" identifies training that is a constituent part of the curriculum. The Supreme Court has recognized that "integral" means "[b]elonging to or making up an integral whole; constituent, component; *spec[ifically]* necessary to the completeness or integrity of the whole; forming an intrinsic portion or element, as distinguished from an adjunct or appendage." *Integrity Staffing Sols., Inc. v. Busk*, 574 U.S. 27, 33 (2014) (quoting 5 Oxford English Dictionary 366 (1933)); *see Integral*, Oxford English Dictionary, https://www.oed.com/dictionary/integral_adj (last visited Oct. 5, 2026) (same definition today). The First Circuit reads the word the same way: "integral" means "a constituent part" of the whole. *United States v. Hoyts Cinemas Corp.*, 380 F.3d 558, 568 (1st Cir. 2004) (citing Random House Dictionary of the English Language 990 (2d ed. 1987)). At bottom, "integral" distinguishes constituent parts from appendages. A for-credit internship listed in the school's catalog, carrying credits toward the degree, and designed and approved in

conjunction with the school is a constituent part of the curriculum the school designed. A summer job a student finds on her own, by contrast, is an appendage.

Moreover, training can be both "integral" while also being "elective" (or "non-mandatory"). Ordinary usage and the Supreme Court both treat "integral" and "mandatory" as distinct concepts. As noted above, in *Busk*, the Court read "integral" to mean "forming an intrinsic portion or element." 574 U.S. at 33. The Court read a different word, "indispensable," to mean that which "cannot be dispensed with, remitted, set aside, disregarded, or neglected." *Id.* Section 214.2(f)(10)(i) uses only "integral," not "indispensable."

The First Circuit has long held the same. In *Ballou v. General Electric Co*., the court found that compulsory classroom study was "neither integral nor indispensable" to apprentices' employment, because compulsion and integrality are independent questions. 433 F.2d 109, 111-12 (1st Cir. 1970); *accord Bienkowski v. Ne. Univ.*, 285 F.3d 138, 141 (1st Cir. 2002) (training required as a condition of continued employment held not integral and indispensable to the employees' principal activities). And when the government last asked the First Circuit to convert the phrase, "integral part of," into an inflexible mandate, the court refused: "Integration is inherently a matter of degree … and the term 'integral' does not tell one anything about how much integration is required." *Hoyts*, 380 F.3d at 568. Reading a rigid rule into the word, the court held, "appears to us not to gloss the word but to rewrite the regulation." *Id.* Where an agency's interpretation "has the practical effect of altering the regulation, a formal amendment—almost certainly prospective and after notice and comment—is the proper course." *Id.* at 569. Elective, for-credit training, in short, is an "integral part of an established curriculum."

From the day it proposed the rule, the government understood the term "integral part of an established curriculum" in exactly this way—that is, to include elective, for-credit training. The

proposed 1991 rule explained that the listed examples of CPT qualified because "students are awarded academic credits," 56 Fed. Reg. at 27,212, which makes them constituent parts of an established school curriculum. When commenters objected that a credit-based line excluded the mandatory non-credit placements common in nursing, law, and engineering, the INS *broadened* the rule, declaring itself "persuaded that required non-credit internships are part of the established curriculum" and adding "any other type of required internship or practicum" to the definition. 56 Fed. Reg. at 55,611, 55,615. The final rule's preamble summarized the finished rule as allowing a student to "participate in any *required* curricular practical training as soon as school begins or in any *elective* curricular practical training after having been in status for nine months." *Id.* at 55,611 (emphases added). The drafters defined "integral part of an established curriculum" to reach elective, for-credit training, and they said so in the Federal Register.

Agency practice is the same. From the month the rule took effect, the agency indicated, unambiguously, that it should cover elective as well as required training. At that time, INS headquarters instructed every field office that "[f]or-credit curricular practical training may be mandatory or elective," January 1992 INS Cable, *supra*, and that course-work CPT "must be either for credit (in the case of an elective course) or required," May 1992 INS Cable, *supra*. In other words, in contemporaneous explanatory documents, the agency made clear that there were two pathways to CPT—and only one required a training program that was mandatory. Moreover, the government confirmed the existence of these two pathways repeatedly over the next thirty-five years, through SEVP's own training of DSOs and DHS's public guidance. *See supra* pp. 10-11. And, of course, during that time, thousands of students have used CPT when it was for-credit, but elective—authorizations reported to the government through SEVIS.

The government's efforts to rewrite the regulation rely principally on a definition plucked from a contemporary online dictionary. *See* Ex. B at 2 (citing merriam-webster.com definition of "integral" as "essential to completeness"). Under the Broadcasts' reading, training is "integral" only if every student in the degree program must complete it to graduate. Nothing in the regulation's text supports that rewrite, because (as described above) "integral" does not mean what the government says it means. Indeed, even the government's preferred source contains as one definition "formed as a unit with another part," *Integral*, Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/integral (last visited Oct. 5, 2026); Compl. ¶ 77 & n.13, which easily includes elective, for-credit training.

Furthermore, even under the agency's own definition of "integral," the Broadcasts' policy mandate does not follow. The August 24 Broadcast defined "integral" as "essential to completeness," Ex. B at 1, but the regulation asks instead whether the training is "an integral part of an established curriculum." 8 C.F.R. § 214.2(f)(10)(i). "[E]ssential to completeness" therefore measures the completeness of the *curriculum* the school established. Strip the clinical placements from a nursing curriculum, and what remains is no longer the program the school designed, regardless of whether each individual student must enroll in such placements. The August 24 Broadcast never explained the leap from "essential to completeness" to "mandatory for every student," and it passes over the same dictionary's alternative, "formed as a unit with another part," which more logically describes a catalog course.

The August 24 Broadcast likewise recast the regulation's text itself, describing CPT as "an integral *and required* part of an educational experience." Ex. B at 1 (emphasis added). The regulation contains no such phrase. The August 24 Broadcast added the second adjective ("required") because the first ("integral") does not carry the meaning the agency needs.

The regulation's own definition of CPT confirms the distinction. "Required" appears once in the regulation, inside the definition's final, residual item: "any other type of *required* internship or practicum." 8 C.F.R. § 214.2(f)(10)(i) (emphasis added). It thus modifies that residual category alone. *See Lockhart v. United States*, 577 U.S. 347, 351 (2016) (a limiting phrase following a list of terms ordinarily modifies only the last antecedent). The structure of the list settles what grammar suggests. "Internship" already appears in the list without a qualifier. If every listed category were required, the closing item "any other type of required internship or practicum"—would duplicate it, and the first "internship" would do no work. The unqualified "internship" has meaning only if elective internships qualify. The drafting history makes clear why the word is there: The INS added the "required" clause in the final rule to capture the non-credit placements commenters had identified, 56 Fed. Reg. at 55,611, 55,615, and the credit-based baseline announced in the proposed rule was never withdrawn or narrowed. *See supra* pp. 9-11. The Broadcasts therefore cannot read "required" into every category and read the elective category out of the regulation without rewriting the text the agency actually promulgated. *See Tapis Int'l v. INS*, 94 F. Supp. 2d 172, 175-76 (D. Mass. 2000) (rejecting as "contrary to the regulatory language" an INS interpretation that read words out of another paragraph of 8 C.F.R. § 214.2).

A neighboring provision adopted in the same rulemaking confirms that "integral part" cannot mean mandatory. The 1991 final rule used the same term in an adjacent provision authorizing F-1 visa holders to engage in some on-campus employment; it required that on-campus employment at an off-campus location "be an integral part of the student's educational program." 8 C.F.R. § 214.2(f)(9)(i). The preamble explained that the INS extended that provision authorizing on-campus employment to include off-campus work as research assistants for professors, including in situations where "professors have contract-based research grants which are not

payable through the educational institutions." 56 Fed. Reg. at 55,609. But research employment of that kind generally is not a degree requirement, and identical words used in different parts of the same regulation should not generally be read to have different meanings.

Nor can the government save the Broadcasts by asking for deference. Deference to an agency's reading of its own regulation is available only when the regulation is "genuinely ambiguous" after a court has exhausted the "traditional tools" of construction, including the regulation's history. *Kisor v. Wilkie*, 588 U.S. 558, 573-75 (2019). Text, structure, drafting history, and thirty-five years of consistent administration resolve this regulation's meaning; there is no ambiguity, and the inquiry ends there. *See Jette v. United of Omaha Life Ins. Co.*, 18 F.4th 18, 32 (1st Cir. 2021). Even were there some ambiguity, an agency interpretation is due deference only when it reflects the agency's "fair and considered judgment," and none is owed to a new position creating "unfair surprise" for regulated parties. *Kisor*, 588 U.S. at 577-79 (citation omitted); *see Christopher*, 567 U.S. at 155-57 (refusing deference where the agency had long tolerated the contrary practice and its new reading would have imposed liability for conduct predating the announcement). Moreover, as the Supreme Court emphasized in *Kisor*, 588 U.S. at 570-71, the case for crediting an agency's reading "works yet less well when lots of time has passed between the rule's issuance and its interpretation—especially if the interpretation differs from one that has come before." *Id.* That caution describes this case.

In short, the Broadcasts are at odds with the text of the regulation and with the agency's consistent statements across thirty-five years. The Broadcasts must be set aside as "not in accordance with law," 5 U.S.C. § 706(2)(A), and—because no statute empowers DHS to amend a duly promulgated regulation through messages broadcast to school officials—"in excess of statutory jurisdiction, authority, or limitations," *id.* § 706(2)(C).

### E. The Broadcasts Are Legislative Rules That Were Issued Without Notice-and-Comment Rulemaking (Count IV).

The APA requires agencies to provide notice and an opportunity for public comment before adopting a "legislative rule." *Perez v. Mortg. Bankers Ass'n,* 575 U.S. 92, 96 (2015); 5 U.S.C. § 553(b), (c). A rule is legislative, rather than interpretive, when it "creates rights, assigns duties, or imposes obligations, the basic tenor of which is not already outlined in the law itself." *N.H. Hosp. Ass'n v. Azar*, 887 F.3d 62, 70 (1st Cir. 2018) (quoting *La Casa Del Convaleciente v. Sullivan*, 965 F.2d 1175, 1178 (1st Cir. 1992)). The First Circuit previously found an agency policy issued in the form of FAQs was a legislative rule where the governing statute left the relevant policy choice to the agency and the FAQs altered obligations imposed by a preexisting regulation. *Id.* at 70-74. The court also identified practical considerations such as a rule's breadth and inconsistency with the agency's prior implementation as evidence that it was legislative. *Id.* Applied here, those factors establish that the Broadcasts similarly set forth a legislative rule.

*First*, the Broadcasts impose a brand-new obligation on institutions, their employees, and students. *See, e.g.*, *Nat'l Educ. Ass'n v. U.S. Dep't of Educ.*, 779 F. Supp. 3d 149, 199 (D.N.H. 2025). They introduce new standards for CPT eligibility, while threatening "administrative or legal consequences" for failure to comply with their mandates. Ex. A at 1; *see supra* p. 17. Because they have the "force and effect of law," they set forth a substantive rule, not a mere interpretation. *Azar v. Allina Health Servs.*, 587 U.S. 566, 573 (2019) (quoting *Perez*, 575 U.S. at 96).

*Second*, the Broadcasts alter "obligations imposed by a preexisting regulation." *N.H. Hosp. Ass'n*, 887 F.3d at 73 (citation omitted). The regulation that has governed CPT since 1991 makes clear that for-credit training qualifies as CPT, whether or not it is required of all students. *See supra* pp. 29-32. By significantly narrowing the range of authorized practical training , the Broadcasts are "inconsistent with another rule having the force of law," *N.H. Hosp. Ass'n*, 887 F.3d at 73

(quoting *Warder v. Shalala*, 149 F.3d 73, 81 (1st Cir. 1998))—providing additional evidence that they required notice-and-comment rulemaking. *See, e.g.*, *NIH*, 770 F. Supp. 3d at 315-16 (agency notice displacing rates negotiated under existing regulation was "inconsistent with a current rule having the force of law" and thus "alter[ed] the agency's and the institutions' obligations").

*Third*, the Broadcasts embody a substantive policymaking choice that the agency previously addressed through regulation. When Congress "leaves such a policy choice to an agency"—as DHS believes Congress has done here—courts "should lean toward finding that the agency's making of that choice requires notice and comment," because an agency exercising a power Congress declined to exercise "cannot claim its implementing rule is an interpretation of the statute." *N.H. Hosp. Ass'n*, 887 F.3d at 71 (quoting *Mendoza v. Perez*, 754 F.3d 1002, 1022 (D.C. Cir. 2014)). Any other conclusion would leave it "difficult to imagine what regulations *would* require notice and comment procedures." *Id.* (quoting *Mendoza*, 754 F.3d at 1021).

*Finally*, "pragmatic considerations reinforce" the conclusion that the rule here is legislative. *N.H. Hosp. Ass'n*, 887 F.3d at 73. The Broadcasts depart from the federal government's longstanding position on CPT eligibility and decades of consistent practice. *See supra* pp. 18-20. In so doing, they upend substantial reliance interests of regulated parties regarding a subject of substantial practical consequence. *See supra* pp. 21-23. "In such circumstances, the burdens that might weigh against requiring notice and comment for interstitial, minor, or confirmatory pronouncements guiding agency operation are much more easily justified in order to ensure the benefits of notice and comment." *N.H. Hosp. Ass'n*, 887 F.3d at 74.

Any attempt by the government to assert that the Broadcasts are merely interpretive rules not subject to notice-and-comment requirements is impossible to square with the 1991 rulemaking, which unmistakably reflected a different intent. *See supra* pp. 9-10. The agency here did not

"derive[] the policy" in the Broadcasts from the governing text but instead "announce[d] a new policy out of whole cloth." *N.H. Hosp. Ass'n*, 887 F.3d at 72. If the CPT eligibility rule announced by the Broadcasts were truly "derived" from the regulation's text, the government would not have spent thirty-five years reading that text to permit what the Broadcasts now forbid.

Nor does the fact that the Broadcasts style themselves as "reminders" and reference the language of the regulation establish otherwise. "[C]ourts have long looked to the *contents* of the agency's action, not the agency's self-serving *label*, when deciding whether statutory notice-and-comment demands apply." *Allina Health Servs.*, 587 U.S. at 575. And here, the Broadcasts did not engage with the regulatory text, beyond a *post hoc* citation to a dictionary definition ("essential to completeness") to justify a rule already announced. Ex. B at 1. The Broadcasts thus reflect a policy choice in interpretive dress, and crediting the costume "would create an easy end run around the APA's procedural protections." *N.H. Hosp. Ass'n*, 887 F.3d at 72-73.

## III. PLAINTIFFS' MEMBERS WILL SUFFER IRREPARABLE HARM ABSENT INJUNCTIVE RELIEF.

Harm is irreparable when it is "not accurately measurable or adequately compensable by money damages." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 19 (1st Cir. 1996). Here, absent an injunction, Plaintiffs' members face the prospect of losing their ability to enroll international students and personal liability for their DSOs, all while sacrificing practical training opportunities for students, paying unrecoverable compliance costs, and losing competitive positioning and goodwill. None of those injuries can be remedied by monetary damages. And all of the harms are imminent: The Broadcasts went into effect immediately, schools have altered their practices and CPT approvals in response, and DSOs already report fearing prosecution and being chilled in the exercise of their regular responsibilities. NAFSA Decl. ¶¶ 16-19. Only injunctive relief can preserve the status quo pending resolution on the merits.

*First*, as long as the Broadcasts remain in effect, students enrolled at Plaintiffs' member institutions will lose unique, time-limited opportunities to engage in practical training. "The loss of a unique" or "evanescent" opportunity is irreparable because its value "may be extremely difficult to measure, after the fact." *Starlight Sugar, Inc. v. Soto*, 114 F.3d 330, 332 (1st Cir. 1997). Courts in this Circuit have applied that principle repeatedly to students' educational and training opportunities—including opportunities lost when the government disrupts international students' F-1 status and training authorization. *See Ozturk v. Trump*, 819 F. Supp. 3d 45, 61 (D. Mass. 2025) (student "losing out on a unique opportunity" to pursue doctoral training;); *Liu v. Noem*, 780 F. Supp. 3d 386, 403 (D.N.H. 2025) (delay and threat to degree completion irreparable where program timelines and funding windows cannot be recaptured); *Monga v. Nat'l Endowment for the Arts*, 323 F. Supp. 3d 75, 93-94 (D. Me. 2018) ("unique, fleeting, one-time opportunity").

Here, these lost opportunities will pile up, semester by semester. Schools are currently considering CPT requests for winter break, and processing for the Spring and Summer 2027 semesters is underway. *E.g.*, PA Decl. ¶ 24; FHDA Decl. ¶¶ 13-14; MSU Decl. ¶ 9; UIUC Decl. ¶ 38; Vanderbilt Decl. ¶ 12; Wisconsin Decl. ¶ 38(a). Moreover, CPT authorizations are tied to specific employers, specific positions, and specific dates. 8 C.F.R. § 214.2(f)(10)(i). An internship that begins in October, a spring clinical placement, a winter-break rotation—each exists in a window, and when the window closes the opportunity is gone. *E.g.*, Cornell Decl. ¶ 19 ("Many internships … operate on fixed recruiting and start-date schedules, and require students to commit months in advance."); MSU Decl. ¶ 9 (students in accounting program will not be able to participate in internships during tax filing season that begins in January without immediate relief). For students in the final year of their studies—a significant percentage of students in two- and four-year programs—there is no later semester in which to make up these opportunities. Their

opportunities are thus not merely delayed; they are denied. Each academic cycle that passes under the Broadcasts converts more students' plans for practical instruction into unrecoverable losses.

*Second*, institutions that follow the regulation as written risk the severe sanctions the Broadcasts threaten explicitly: loss of SEVP certification. A court in this District has credited evidence that the loss of this certification would "irreparably harm[]" an institution's "ability to compete with other institutions for the most qualified applicants at home and abroad." *President & Fellows of Harvard Coll. v. U.S. Dep't of Homeland Sec.*, 788 F. Supp. 3d 182, 209-10 (D. Mass.) (quoting record), *appeal docketed*, No. 25-1627 (1st Cir. July 1, 2025). That threat operates on institutions now, before any enforcement: It is the reason members have stopped authorizing CPT opportunities that the regulation's text and longstanding agency interpretation permit. *E.g.*, UPenn Decl. ¶ 8; Grinnell Decl. ¶ 9. In addition, DSOs, threatened personally with "penalties for providing false information," Ex. A at 1, are chilled in advising students and processing requests for CPT. NAFSA Decl. ¶¶ 16-19. The Broadcasts' "threat[s] of enforcement and the uncertainty that stems from [them] is likely sufficient" to establish irreparable harm. *New York v. U.S. Dep't of Justice*, 804 F. Supp. 3d 294, 331 (D.R.I. 2025); *see also City & Cnty. of San Francisco v. Trump*, 783 F. Supp. 3d 1148, 1186 (N.D. Cal. 2025) (irreparable harm based on "[u]ncertainty about whether" challenged executive orders would be enforced).

The harm from threatened enforcement is particularly clear because the exposure is retrospective as well as prospective. Institutions and DSOs risk sanctions not only related to authorizations that postdate the Broadcasts; they face potential consequences for authorizations that complied fully with the framework in effect when they were granted, *see supra* pp. 27-29—a hazard that no later judgment can retroactively remove. Immediate injunctive relief is necessary to redress the *present* threat of enforcement hanging over individual DSOs and institutions.

*Third*, institutions are incurring unrecoverable compliance costs. Since August 12, Plaintiffs' member institutions have halted authorizations mid-stream, re-reviewed pending CPT requests against the new standard, begun auditing curricula program by program, revised student-facing guidance, and fielded a surge of inquiries from students whose plans the Broadcasts upended. *E.g.*, MSU Decl. ¶ 7.3.2 (student support offices "have seen a substantial increase in international student advising appointments"); WashU Decl. ¶ 11 (programs "are undertaking emergency approval processes to consider changes in response to the" Broadcasts, diverting faculty and administrators from other responsibilities); Columbia Decl. ¶ 7 (the "volume of inquiry [from students] … [is] not sustainable with [Columbia's] current staffing model").

None of these costs is recoverable. The First Circuit has held that "administrative upheaval" from complying with government directives—overhauling systems, retraining staff, revising guidance—is irreparable harm. *Doe v. Trump*, 157 F.4th 36, 79 (1st Cir. 2025), *cert. denied*, No. 25-899, 2026 WL 1871309 (U.S. June 30, 2026); *see also Massachusetts v. Dep't of Educ.*, 828 F. Supp. 3d 198, 221-22 (D. Mass. 2026) (restructuring compliance systems and diverting staff from core functions irreparable where enforcement threats flowed from the directive's mandatory language); *New York*, 804 F. Supp. 3d at 330 ("the confusion and chaos imposed by an overnight change to a thirty-year-old interpretation of a law, as well as the resulting change in plans that comes from it, is a form of irreparable harm"). The APA does not waive the government's immunity from money damages, *see Department of Education v. California*, 604 U.S. 650, 651 (2025), and the unavailability of damages "goes a long way toward establishing irreparable injury," *Rosario-Urdaz v. Rivera-Hernandez*, 350 F.3d 219, 222 (1st Cir. 2003). Courts in this District have applied exactly this reasoning to universities forced to reorganize their operations around unlawful federal directives. *See, e.g.*, *AAU v. DOD*, 792 F. Supp. 3d at 176-77.

*Fourth*, institutions are losing competitive position and goodwill. *See Ross-Simons of Warwick, Inc.*, 102 F.3d at 20 ("By its very nature injury to goodwill and reputation is not easily measured or fully compensable in damages."). Experiential learning is a pillar of higher education in the United States—and a key part of its appeal to international students. The Broadcasts strip those opportunities from F-1 students alone, while their domestic classmates retain full access. Colleges and universities face erosion of partnerships built over years, reputational damage among prospective international applicants weighing offers now for terms that begin in the near-term, and the loss of enrolled international students' trust. *E.g.*, Cornell Decl. ¶ 25 (international students have indicated "that the significant narrowing of [CPT] … creates a strong disincentive to" study in the United States); FHDA Decl. ¶ 15 (explaining that while FHDA's "location in Silicon Valley has historically been an important recruitment advantage," the Broadcasts "harm FHDA's ability to recruit and retain international students"); Columbia Decl. ¶ 8 ("the lack of available practical work opportunities[] caus[es] some of our students to pursue educational options elsewhere, in many cases internationally."); AICUM Decl. ¶ 9 (Broadcasts harm member institutions by "harming their reputation and competitiveness within higher education"). Courts in this District have found irreparable harm to institutions of higher education where they have experienced delayed or abandoned programs, including research programs, and the loss of specialized talent. *See, e.g.*, *AAU v. DOE*, 789 F. Supp. 3d at 149-51; *AAU v. DOD*, 792 F. Supp. 3d at 176-77.

## IV. THE EQUITIES AND THE PUBLIC INTEREST FAVOR PLAINTIFFS.

When the government is a party, the final two factors of the preliminary injunction inquiry merge. *Nken*, 556 U.S. at 435. Here, the two factors weigh decisively for Plaintiffs.

The equities on Plaintiffs' side are clear: the mounting, irreparable injuries described above, including students' lost training, institutions' unrecoverable costs, and officials' personal legal exposure. But the broader public interest also favors a preliminary injunction. Thousands of

students engage in CPT annually—by SEVP's count, more than 130,000 in 2024.[11] Those students support hundreds of organizations nationwide in a wide range of industries. And the general public gains from the contributions international students make to American society through their training and research. Under the Broadcasts, however, a wide range of organizations are no longer able to benefit from CPT internships—such as the church that no longer has a music director, or the local company that no longer has interns, or the federal judge that no longer has a judicial extern. *See* PA Decl. ¶ 20; Wisconsin Decl. ¶ 37(a); NAFSA Decl. ¶ 13; UIUC Decl. ¶ 22.

By contrast, the government has no cognizable interest in a sudden departure from longstanding CPT eligibility standards. The government cannot claim injury from an injunction that preserves the interpretation it adopted in 1991, reaffirmed for thirty-five years, and enforced without apparent difficulty until the Broadcasts issued mere weeks ago. And "there is generally no public interest in the perpetuation of unlawful agency action." *Somerville Pub. Schs. v. McMahon*, 139 F.4th 63, 76 (1st Cir. 2025) (citation omitted). Because Plaintiffs are likely to succeed in showing that the Broadcasts are unlawful, the public interest favors enjoining the agency action, at least long enough for this Court to review their legality.

Moreover, in neither Broadcast—and in no subsequent agency announcement or guidance—has the government ever explained why narrowing the overall universe of available CPT opportunities is important to the public or the federal government. While the August 12 Broadcast asserted an unquantified rise in noncompliant authorizations and invites reports of "employment fraud" and "practical training fraud," neither Broadcast creates additional tools to address fraud. Ex. A at 1-2. This is perhaps unsurprising, as SEVP has remained fully able to police

[11] Student and Exchange Visitor Program, U.S. Immigration and Customs Enforcement, *2024 SEVIS by the Numbers Report*, at 13, 15-16 , https://www.ice.gov/doclib/sevis/btn/25_0605_2024-sevis-btn.pdf (June 5, 2025).

fraud under the interpretation an injunction would preserve. *See generally* 8 C.F.R. § 214.3(g), (h). The August 24 Broadcast also stated that "[a]ccurate and timely reporting by schools and students allows SEVP to manage" SEVIS, which it calls "a critical tool in SEVP's mission to protect national security and ensure the integrity of the nation's educational and cultural exchange programs." Ex. B at 1. But the new regulatory interpretation announced in the Broadcasts does not bear on whether reporting is "[a]ccurate and timely," and neither Broadcast supplied a logical thread between national security and the revised CPT eligibility requirements.

The absence of any clear basis for the sudden departure from the government's longstanding position, and "[t]he weakness of the connection between the rule and its purported rationales[,] raise[] legitimate questions as to whether its real purpose is … to achieve other, undisclosed, goals." *Presidents' All. on Higher Educ. & Immigr. v. U.S. Dep't of Homeland Sec.*, --- F. Supp. 3d ---, 2026 WL 2690098, at *5 (D. Mass. Sept. 14, 2026). Because the government cannot articulate any legitimate interest in immediate implementation of the Broadcasts at hand, the equities and public interest favor the grant of a preliminary injunction.

## V. THE COURT SHOULD STAY AND ENJOIN THE BROADCASTS AND THEIR POLICY.

Plaintiffs request that the Court provide two forms of temporary relief. First, the Court should stay the Broadcasts under 5 U.S.C. § 705, postponing their effective date pending judicial review. A stay is warranted and sensible here because the Broadcasts are a single directive addressed to every SEVP-certified institution through a single system.[12] Second, the Court should

[12] *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), does not counsel otherwise. *CASA* addressed universal injunctions benefiting nonparties, and "[n]othing" in it "resolves the distinct question whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action." *Id.* at 847 n.10. Indeed, even after *CASA*, district courts may "grant or deny the functional equivalent of a universal injunction—for example, by . . . preliminarily setting aside or declining to set aside an agency rule under the APA." *Id.* at 873 (Kavanaugh, J., concurring).

issue a preliminary injunction barring Defendants from implementing or enforcing the Broadcasts' interpretation of the CPT regulation as to Plaintiffs, their members, and their member institutions' employees and students—including any retroactive application to CPT requested, authorized, or completed before the Broadcasts issued. *See, e.g.*, *Doe v. Trump*, 157 F.4th at 80 (affirming grant of preliminary injunction to associational plaintiffs' members). Even if the Broadcasts are stayed, injunctive relief is necessary to ensure that SEVP does not punish Plaintiffs or their members based on the same unlawful interpretation of the CPT regulation.

Under Rule 65(c), no security is warranted. "[T]he First Circuit has recognized an exception to the … bond requirement … in 'suits to enforce important federal rights or public interests.'" *Westfield High Sch. L.I.F.E. Club v. City of Westfield*, 249 F. Supp. 2d 98, 129 (D. Mass. 2003) (quoting *Crowley v. Local No. 82, Furniture & Piano Moving*, 679 F.2d 978, 1000 (1st Cir. 1982), *rev'd on other grounds*, 467 U.S. 526 (1984)). And courts in this District have applied this exception in suits to enforce federal or public rights against federal agencies and other governmental entities. *See, e.g.*, *id.*; *Mass. Fair Hous. Ctr. v. U.S. Dep't of Hous. & Urb. Dev.*, --- F. Supp. 3d ---, 2026 WL 2521944, at *12 (D. Mass. Aug. 26, 2026). The exception fits perfectly here: Defendants face no monetary loss from an order preserving the regime they have administered for thirty-five years, and Plaintiffs are nonprofit associations suing to enforce the APA's substantive and procedural guarantees and to enjoin unlawful governmental action.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' motion, preliminarily enjoin Defendants from implementing or enforcing the Broadcasts' interpretation of 8 C.F.R. § 214.2(f)(10)(i), including retroactively, and stay the Broadcasts under 5 U.S.C. § 705 until judicial review concludes. A proposed order is submitted herewith.

Dated: October 5, 2026

Respectfully submitted,

JENNER & BLOCK LLP

By: */s/ Shoba Pillay*

Shoba Pillay, BBO No. 659739
353 North Clark Street
Chicago, IL 60654
Tel: (312) 222-9350
SPillay@jenner.com

Ishan K. Bhabha (*pro hac vice pending*)
Lindsay C. Harrison (*pro hac vice pending*)
Ian Heath Gershengorn (*pro hac vice pending*)
Elizabeth Henthorne (*pro hac vice pending*)
Anjali Motgi (*pro hac vice pending*)
Daniel Schwei (*pro hac vice pending*)
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
Tel: (202) 639-6000
IBhabha@jenner.com
LHarrison@jenner.com
IGershengorn@jenner.com
BHenthorne@jenner.com
AMotgi@jenner.com
DSchwei@jenner.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 5, 2026, this document, filed through the CM/ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants.

*<u>/s/ Shoba Pillay</u>*
Shoba Pillay, BBO No. 659739
Jenner & Block LLP
353 North Clark Street
Chicago, IL 60654
Tel: (312) 222-9350
SPillay@jenner.com

Dated: October 5, 2026