**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ASSOCIATION OF AMERICAN UNIVERSITIES, PRESIDENTS' ALLIANCE ON HIGHER EDUCATION AND IMMIGRATION, ASSOCIATION OF INDEPENDENT COLLEGES AND UNIVERSITES IN MASSACHUSETTS, and NAFSA: ASSOCIATION OF INTERNATIONAL EDUCATORS,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. DEPARTMENT OF JUSTICE, MARKWAYNE MULLIN, DAVID VENTURELLA, and TODD BLANCHE,<br><br>Defendants. | No. 1:26-cv-14520-JEK |

**MEMORANDUM AND ORDER ON PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION AND STAY OF AGENCY ACTION**

**KOBICK, J.**

This case challenges two Broadcast Messages issued by the Student and Exchange Visitor Program ("SEVP") of the Department of Homeland Security in August 2026. The broadcasts concerned curricular practical training ("CPT") for international students on nonimmigrant F-1 visas in the United States. CPT includes any "alternative work/study, internship, cooperative education or any other type of required internship or practicum" that is "an integral part of an established curriculum." 8 C.F.R. § 214.2(f)(10)(i). Since 1991, the federal government has construed this definition of CPT to include any training opportunity for which students receive academic credit at a certified institution, regardless of whether that opportunity was mandatory or

optional for the degree program. In August 2026, however, SEVP changed course—without any acknowledgement—to no longer permit elective training taken for credit. The disputed broadcasts made clear that the training opportunity must be required for *all* students in the degree program to qualify as CPT, and they threatened civil and criminal liability for failure to comply with this new directive. In practice, for example, this meant that a law school could not authorize CPT for a law student on an F-1 visa to extern for a federal judge for academic credit unless such an externship was required of all students seeking to earn a juris doctor degree.

Colleges and universities responded to the broadcasts this fall by denying or rescinding CPT authorization for international students and modifying their programs' curricula. In early October 2026, the plaintiffs—the Association of American Universities ("AAU"), Presidents' Alliance on Higher Education and Immigration, Association of Independent Colleges and Universities in Massachusetts ("AICUM"), and NAFSA: Association of International Educators—brought this lawsuit on behalf of their members, which include SEVP-certified institutions. They have sued the Department of Homeland Security ("DHS") and its Secretary, Markwayne Mullin; U.S. Immigration and Customs Enforcement ("ICE") and its Acting Director, David Venturella; and the Department of Justice and the Attorney General, Todd Blanche. The complaint claims that the Broadcast Messages violate the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 706(2)(A)-(D), because they are arbitrary and capricious, impermissibly retroactive, contrary to law, and procedurally invalid.

Pending before the Court is the plaintiffs' motion for a preliminary injunction pursuant to Federal Rule of Civil Procedure 65(a) and for a stay of agency action under 5 U.S.C. § 705. That motion will be granted. The plaintiffs have associational standing to sue on behalf of their members, and the Broadcast Messages are final agency action subject to APA review. On the

merits, the plaintiffs are likely to succeed on their claim that the broadcasts are arbitrary and capricious because SEVP departed from its longstanding position of treating elective for-credit training as CPT without acknowledging, let alone explaining, the change or considering serious reliance interests. Through the fifteen submitted declarations, the plaintiffs have established that their members would suffer irreparable harm absent preliminary injunctive relief because those members have already expended substantial resources to comply with the broadcasts, which threaten loss of SEVP certification. The plaintiffs have also shown that the balance of the equities and the public interest favor such relief. Accordingly, a stay of action and preliminary injunction will be granted, such that the broadcasts may not be enforced or applied pending judicial review and the defendants cannot implement the broadcasts' regulatory interpretation against the plaintiffs or their members.

## BACKGROUND

### I. Statutory and Regulatory Framework.

International nonimmigrant students may obtain F-1 visas "to pursue a full course of study" at an institution in the United States that has been "approved by" the federal government. 8 U.S.C. § 1101(a)(15)(F)(i). SEVP administers the F-1 visa system and makes such approvals or certifications. 8 C.F.R. § 214.3. SEVP is part of ICE, which is, in turn, part of DHS. Each certified school has a Designated School Official ("DSO") who monitors, oversees, and advises the F-1 students on campus. *Id.* § 214.3(*l*). The DSO also maintains those students' records in an online database called the Student and Exchange Visitor Information System ("SEVIS"). *Id.*; *see id.* § 214.2(f)(1)(iii). When SEVP decides to withdraw an institution's certification, it provides that institution with notice about the grounds for withdrawal and an opportunity to contest those grounds. *Id.* § 214.4(b). If certification is withdrawn, the institution cannot enroll new F-1 students

and "must wait at least one calendar year from the date of . . . withdrawal on notice before being eligible to petition again for SEVP certification." *Id.* §§ 214.4(a)(2), (i).

To maintain their status, F-1 students may participate in "practical training . . . that is directly related to their major area of study." *Id.* § 214.2(f)(10). Such training comes in two forms: curricular practical training and optional practical training ("OPT"). *Id.* CPT is an "alternative work/study, internship, cooperative education, or any other type of required internship or practicum that is offered by sponsoring employers through cooperative agreements with the school" and "is an integral part of an established curriculum." *Id.* § 214.2(f)(10)(i). The DSO approves students' requests for CPT and updates their records in SEVIS. *Id.* In contrast, OPT allows F-1 students to seek "temporary employment" related to their major area of study, but the employment need not be "an integral part of an established curriculum." *Id.* § 214.2(f)(10)(ii).

The operative CPT regulation was promulgated in 1991. In the 1991 proposed rule, the then-controlling agency—Immigration and Naturalization Service ("INS")—stated that training "for which students are awarded academic credits" may be "authorized by the DSO" as CPT. 56 Fed. Reg. 27,211, 27,212 (June 13, 1991). In the final rule, INS maintained its interpretation of the CPT regulation as including training "where students are awarded academic credits." 56 Fed. Reg. 55,608, 55,611 (Oct. 29, 1991). But INS was "persuaded" by commenters "that required non-credit internships are [also] part of the established curriculum" and should likewise qualify as CPT. *Id.* INS thus adopted a "broader definitio[n]" of CPT to "includ[e] required noncredit internships or practicum" as well. *Id.* This meant, as the final rule explained, that a training program is an "integral part of an established curriculum" for CPT purposes if an F-1 student "participate[s] in any *required* curricular practical training as soon as school begins *or* in any *elective* curricular practical training after having been in status for nine months." *Id.* (emphases added).

Since 1991, the government has repeatedly confirmed that elective practical training, taken for academic credit, qualifies as CPT. A January 1992 cable, for example, provided that "[f]or-credit curricular practical training may be mandatory or elective." INS Cable, File CO 243.69-C (Jan. 22, 1992), *reprinted* in 69 Interpreter Releases 187, 187 (Feb. 10, 1992). Likewise, a cable from May 1992 stated that when "offered through course work as an integral part of the established curriculum, . . . curricular training must be either for credit (in the case of an elective course) or required." INS Cable, File CO 214f.2-C (May 4, 1992), *reprinted* in 69 Interpreter Releases 587, 587 (May 11, 1992). In an October 2013 newsletter, SEVP explained that CPT is "'an integral part of an established curriculum'" and "must be part of a student's program of study, either required for completion or optional, but for academic credit." SEVP, *CTCEU Update: Practical Training for F and M Students*, at 3 (Oct. 2013).[1] SEVP's training materials for DSOs in 2014 and 2022 also instructed that "'integral part of an established curriculum'" for purposes of CPT "means an opportunity must be required by the curriculum or, if not required, the student must receive credit for the training." SEVP, *Training for Designated School Officials*, at 48.[2]

## II. <u>Factual and Procedural Background.</u>

SEVP issued two Broadcast Messages in August 2026. *See* ECF 1-1, 1-2. The first, issued on August 12, was titled "Reminder of Liability for DSOs Regarding CPT Authorization." ECF 1-1, at 1 (bold omitted). This broadcast "remind[ed]" DSOs of their responsibilities and announced that SEVP was "increasing its scrutiny of CPT approvals to ensure compliance with federal regulations" because it had "observed a rise in CPT authorizations that do not . . . constitut[e] an

---

[1] *Available* at https://studyinthestates.dhs.gov/assets/sevp_spotlight_november_2013.pdf [https://perma.cc/5JRA-WH36].

[2] *Available* at https://web.archive.org/web/20140823202052/http:/www.ice.gov/doclib/sevis/pdf/SEVP_DSO_Training.pdf (Aug. 23, 2014 capture); https://web.archive.org/web/20220817220749/http://www.ice.gov/doclib/sevis/pdf/SEVP_DSO_Training.pdf (Aug. 17, 2022 capture).

integral part of an established curriculum." *Id.* (bold omitted). CPT must be "a core and essential part of the student's studies, without which, they would be unable to complete their degree," the broadcast stated. *Id.* This means, it added, that DSOs may authorize CPT only "if its absence would make the attainment of a degree an impossibility and if the work associated with CPT is required for *all* students pursuing that degree." *Id.* at 2. The August 12 broadcast also explained that DSOs' authorizations are made "under penalty of perjury," and it warned of "administrative or legal consequences" for noncompliance, including "withdrawal of SEVP certification and potential penalties for providing false information or misrepresenting the nature of the training." *Id.* at 1-2. In a closing paragraph, the broadcast asserted that it is not "a rule or a final action by SEVP" and "may not be relied upon to create any right or benefit . . . enforceable at law." *Id.* at 2.

The second broadcast, titled "Guidance for Designated School Officials regarding Curricular Practical Training," was issued on August 24, 2026. ECF 1-2, at 1 (bold omitted). This broadcast reiterated that, under "clear regulatory requirements" for CPT, "all students enrolled in the established curriculum must participate in and complete practical training." *Id.* at 2 (bold omitted). Since CPT, unlike OPT, "operates as an integral and required part of an educational experience," it cannot "be offered as a part of an elective course" that is "optional," the broadcast represented. *Id.* (bold omitted). To support this position, SEVP invoked an online dictionary definition of "integral" to mean "'essential to completeness,'" as well as "[p]rior broadcast messages" that distinguish between CPT and OPT. *Id.* at 2-3 (hyperlink omitted). The August 24 broadcast cautioned that "[f]ailure to comply with SEVP regulations may result in an institution losing certification to enroll foreign students." *Id.* at 1. This broadcast, too, ended with a disclaimer that it is not "a rule or a final action by SEVP" and "may not be relied upon to create any [enforceable] right or benefit." *Id.* at 3.

In response to the two Broadcast Messages, many SEVP-certified institutions stopped authorizing CPT for elective for-credit training and started revising their fall curricula. Columbia University, for example, "had to deny authorization to over 120 international students for Fall CPT" and "revisi[t] [its] Fall career guidance sessions." ECF 8-5, ¶¶ 6-7. Washington University in St. Louis was similarly "forced . . . to reevaluate existing curricula." ECF 8-14, ¶ 11. Likewise, at Cornell University, many programs began to consider "formalizing [practical training] experiences as mandatory degree requirements for all students." ECF 8-6, ¶ 16. Other institutions "rescinded previously authorized CPT for fall-term internships." ECF 8-4, ¶ 7. At Grinnell College, for instance, at least thirteen students lost internship opportunities for this fall. ECF 8-9, ¶ 10. Some institutions, like Cornell and Michigan State University, have already lost students because of the broadcasts. ECF 8-6, ¶ 27; ECF 8-11, ¶ 7.4.2. Further, DSOs have reported "increased stress and distress" as well as a reluctance to sign documents for SEVP due to "fear of personal liability." ECF 8-4, ¶¶ 16-17. Dartmouth College and Vanderbilt University describe the "chilling effect" of these broadcasts on DSOs, who are concerned about prosecution. ECF 8-7, ¶ 14; ECF 8-13, ¶ 10.

On October 5, 2026, the plaintiffs filed this action, on behalf of their members, seeking to invalidate the SEVP's two August 2026 Broadcast Messages. ECF 1. AAU represents 69 public and private research universities in the United States. ECF 8-1, ¶ 6. Presidents' Alliance represents nearly 600 colleges and universities in 42 states, Washington, D.C., and Puerto Rico. ECF 8-2, ¶ 3. AICUM represents 55 private colleges and universities in Massachusetts. ECF 8-3, ¶ 3. And NAFSA represents over 9,000 members and international educators, most of whom—including DSOs—are in the United States. ECF 8-4, ¶¶ 2-3. Asserting four claims, the complaint alleges that the broadcasts are arbitrary and capricious (Count I), impermissibly retroactive (Count II), contrary

to law (Count III), and procedurally invalid (Count IV), in violation of the APA, 5 U.S.C. §§ 706(2)(A)-(D). ECF 1, ¶¶ 102-34.

That same day, the plaintiffs moved for a stay under 5 U.S.C. § 705 and for a preliminary injunction that would bar the defendants from enforcing the August 2026 broadcasts during this litigation. ECF 8; *see* ECF 8-17. In support of that motion, the plaintiffs filed fifteen declarations, four authored by them and the others by eleven of their member SEVP-certified institutions. *See* ECF 8-1 through 8-15. After receiving the parties' briefs, the Court held a hearing on November 6, 2026 and took the motion under advisement. ECF 18, 27, 32, 33.

**STANDARD OF REVIEW**

"A preliminary injunction is an 'extraordinary' equitable remedy that is 'never awarded as of right.'" *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345-46 (2024) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)). To secure a preliminary injunction, the plaintiffs bear the burden to establish: "(1) a substantial likelihood of success on the merits, (2) a significant risk of irreparable harm if the injunction is withheld, (3) a favorable balance of hardships, and (4) a fit (or lack of friction) between the injunction and the public interest." *NuVasive, Inc. v. Day*, 954 F.3d 439, 443 (1st Cir. 2020) (quotation marks omitted). "The first two factors are the most important." *Together Emps. v. Mass Gen. Brigham Inc.*, 32 F.4th 82, 85 (1st Cir. 2022). The third and fourth factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). "In determining whether to postpone or stay agency action under § 705, courts evaluate the same four factors that govern the issuance of a preliminary injunction." *Presidents' All. on Higher Educ. & Immigr. v. U.S. Dep't of Homeland Sec.*, No. 26-cv-13799-FDS, 2026 WL 2690098, at *13 (D. Mass. Sept. 14, 2026).

## DISCUSSION

### I. **Standing.**

The government contends at the outset that the plaintiffs lack Article III standing to advance their claims. The plaintiffs respond that, as associations, they have standing to bring suit on behalf of their members. *See Housatonic River Initiative v. U.S. Env't Prot. Agency, New England Region*, 75 F.4th 248, 264 (1st Cir. 2023). To establish associational standing, each plaintiff "must show that (1) 'its members would otherwise have standing to sue in their own right;' (2) 'the interests it seeks to protect are germane to the organization's purpose;' and (3) 'neither the claim nor the requested relief requires the participation of individual members in the lawsuit.'" *Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, 186 F.4th 25, 37 (1st Cir. 2026) (quoting *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023)).

The government disputes only the first element. In its view, the plaintiffs' members have not been injured because the Broadcast Messages "merely remind DSOs of the requirements for authorization of CPT training and that they comply with the regulatory requirements," and because those "members can continue to authorize CPT for international students provided the training is integral to the students' chosen field of study." ECF 27, at 10-11. This argument depends on the government's assertion that the broadcasts do not reflect a change in SEVP's interpretation of the CPT regulation. That assertion is, however, belied by the record before the Court, which demonstrates the government's longstanding view that the definition of CPT in 8 C.F.R. § 214.2(f)(10)(i) includes elective internships and training opportunities taken for credit, even if those opportunities are not required of all students in the degree program.

In the 1991 proposed and final rules, INS explained that CPT includes training where "students are awarded academic credits." 56 Fed. Reg. at 55,611; 56 Fed. Reg. at 27,212. INS twice represented in cables from 1992 that CPT covers elective, not just required, training for credit. *See* INS Cable (Jan. 22, 1992); INS Cable (May 4, 1992). SEVP observed in an October 2013 newsletter that training "either required for completion or optional, but for academic credit," qualifies as CPT. SEVP, *CTCEU Update: Practical Training for F and M Students*, at 3. SEVP's training materials published since—as recently as August 2022—reiterated that CPT "must be required by the curriculum or, if not required, the student must receive credit for the training." SEVP, *Training for Designated School Officials*, at 48. But in August 2026, SEVP adopted a new and contrary position. Its August 12 broadcast said that to count as CPT, the training opportunity must be "required for *all* students pursuing that degree." ECF 1-1, at 2. The subsequent August 24 broadcast reaffirmed that CPT cannot "be offered as a part of an elective course," thus excluding training opportunities where F-1 students receive academic credit, if such opportunities are not required of all students in the degree program. ECF 1-2, at 1 (bold omitted).

Given the disruption occasioned by this departure from SEVP's prior interpretation of 8 C.F.R. § 214.2(f)(10)(i), each plaintiff has sufficiently demonstrated that "at least one of its members would have standing to sue as an individual" to challenge the August 2026 broadcasts. *Housatonic River*, 75 F.4th at 265 (quotation marks omitted). The two broadcasts are directed to "DSOs at SEVP-certified Schools." ECF 1-1, at 1; ECF 1-2, at 1. The August 12 broadcast states that CPT authorization inconsistent with SEVP's new regulatory interpretation "may subject both the institution and individual DSO to administrative or legal consequences." ECF 1-1, at 1. The August 24 broadcast similarly warns that noncompliance "may result in an institution losing certification to enroll foreign students." ECF 1-2, at 1.

Since SEVP-certified institutions and DSOs are clearly objects of the two broadcasts, there is little question that those broadcasts have inflicted injuries and that invalidating the broadcasts will redress their injuries. *See Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 112 (2025). The plaintiffs have filed fifteen declarations detailing how their members, which include DSOs and SEVP-certified institutions, have been harmed. Columbia University, for example, has had to deny CPT authorization for more than 120 international students, spend "countless hours" modifying its career guidance for the fall semester, and address a "volume of inquiry [that] is not sustainable with [its] current staffing model." ECF 8-5, ¶¶ 6-7; *see* ECF 8-1, ¶¶ 14-24; ECF 8-2, ¶¶ 11-22. The loss of experiential learning opportunities caused by the broadcasts contributed to students' decisions to discontinue programs of study at Michigan State University and Cornell University. ECF 8-6, ¶ 27; ECF 8-11, ¶ 7.4.2. DSOs are also under increased stress and are reluctant to sign documents for SEVP out of fear of potential liability. ECF 8-4, ¶¶ 16-17. By permitting the plaintiffs' members to resume authorizing CPT under SEVP's prior interpretation of the CPT regulation, the relief requested by the plaintiffs would redress these injuries. ECF 8-1, ¶ 25; ECF 8-2, ¶ 23.

The government faults the plaintiffs for not identifying any concrete enforcement action taken following the August 2026 broadcasts. But an enforcement action is not a prerequisite to challenging the broadcasts where, as here, those broadcasts expressly threaten universities and DSOs with liability for failure to comply with SEVP's new standard. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). Accordingly, the evidence in the record is sufficient to establish that at least one of each plaintiffs' members has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant[s], and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

The other two prongs of the associational standing analysis, which the government does not contest, are also satisfied. The interests at stake are germane to the plaintiffs' purposes, including promoting the enrollment and education of international students. ECF 8-1, ¶ 5; ECF 8-2, ¶ 5; ECF 8-3, ¶ 4; ECF 8-4, ¶¶ 2-3. And individual members' participation is not required for the APA claims asserted here or the "prospective relief" requested. *Housatonic River*, 75 F.4th at 265 (quotation marks omitted); *see Camel Hair & Cashmere Inst. of Am., Inc. v. Associated Dry Goods Corp.*, 799 F.2d 6, 12 (1st Cir. 1986) ("Actions for declaratory, injunctive and other forms of prospective relief have generally been held particularly suited to group representation."). The plaintiffs have therefore sufficiently established associational standing.

## II. Likelihood of Success on the Merits.

The plaintiffs contend that they are likely to succeed on the merits of their four APA claims. The government responds that the Broadcast Messages are not final agency actions subject to APA review and that the APA claims are otherwise unlikely to succeed. The Court addresses the government's threshold argument first before turning to the merits.

### A. Final Agency Action.

The government argues that the Broadcast Messages are not subject to judicial review under the APA because they do not constitute final agency actions. The APA states that "final agency action . . . [is] subject to judicial review" and authorizes courts to "hold unlawful and set aside" such actions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or inconsistent with "procedure required by law." 5 U.S.C. §§ 704, 706(2)(A), (D). For an agency action to be "final," the action (1) "'must mark the consummation of the agency's decisionmaking process'" and thus "'not be of a merely tentative or interlocutory nature,'" and (2) "'must be one by which rights or obligations have been determined, or from

which legal consequences will flow.'" *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016) (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)).

Both components of the test are satisfied here. Neither broadcast indicates that it is "merely tentative or interlocutory." *Bennett*, 520 U.S. at 178. The August 12 broadcast states that SEVP "is increasing its scrutiny of CPT approvals to ensure compliance with" its interpretation of 8 C.F.R. § 214.2(f)(10)(i). ECF 1-1, at 1. The August 24 broadcast provides further "guidance" and "additional information" on the same regulatory interpretation. ECF 1-2, at 1. These statements do no suggest that SEVP's "decisionmakers [are] free to change their minds" on how they interpret the scope of CPT under the regulation, nor do they set forth a timeline for further guidance from the agency. *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 592 U.S. 261, 269 (2021) (quotation marks omitted). Rather, the statements reflect that the broadcasts are SEVP's "'last word on the matter.'" *Omnipoint Holdings, Inc. v. City of Cranston*, 586 F.3d 38, 46 (1st Cir. 2009) (quoting *Harrison v. PPG Indus., Inc.*, 446 U.S. 578, 586 (1980)). The government's opposition confirms this understanding by characterizing the broadcasts as "*prospective* interpretations of regulatory text." ECF 27, at 20 (emphasis added).

The broadcasts also determine the legal "rights or obligations" of DSOs and SEVP-certified institutions, and they specify "legal consequences" for noncompliance. *Hawkes Co.*, 578 U.S. at 597 (quotation marks omitted). They use mandatory language that "reads like a command" about what regulated parties must do to comply with SEVP's changed interpretation of the controlling regulation. *Woonasquatucket River*, 186 F.4th at 43; *see Biden v. Texas*, 597 U.S. 785, 808-10 (2022) (legal memoranda constituted final agency action because they were "'designed to implement, interpret, or prescribe law or policy'" (quoting 5 U.S.C. § 551(4))). As the broadcasts say, universities risk "losing [SEVP] certification to enroll foreign students" if they do not comply

with the agency's new regulatory interpretation. ECF 1-2, at 1. DSOs separately face "administrative or legal consequences," including "potential penalties for providing false information or misrepresenting the nature of the training." ECF 1-1, at 1-2. Given these direct threats of liability, organizations representing DSOs and SEVP-certified institutions "need not await enforcement proceedings" to challenge the broadcasts. *Hawkes Co.*, 578 U.S. at 600; *see Texas v. EEOC*, 933 F.3d 433, 441-46 (5th Cir. 2019) (second prong met where guidance had "the effect of committing the agency itself to a view of the law that, in turn, force[d] the plaintiff either to alter its conduct, or expose itself to potential liability" (quotation marks omitted)).

The government protests that the Broadcast Messages did not "alter the legal regime" because they merely constituted reminders about the requirements of CPT. *Bennett*, 520 U.S. at 178. As explained, however, the broadcasts represent a marked departure from the agency's prior interpretation of 8 C.F.R. § 214.2(f)(10)(i). *See Florida Agency for Health Care Admin. v. Adm'r for Ctrs. for Medicare & Medicaid Servs.*, 161 F.4th 765, 779 (11th Cir. 2025) (bulletin was final agency action because, while "appear[ing] to restate a preexisting interpretation," it "demand[ed] that regulated parties take action" and warned of "the dire consequences of non-compliance"). The government also points to the broadcasts' disclaimers, which state that broadcasts are not "a rule or a final action by SEVP" and "may not be relied upon to create any [enforceable] right or benefit." ECF 1-1, at 2; ECF 1-2, at 3. But such "boilerplate" language is not dispositive—particularly where, as here, the guidance document adopts a concrete interpretation of a regulation, with immediate consequences, and contains "commands" and "orders." *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000); *see Presidents' All. on Higher Educ. & Immigr. v. Noem*, 824 F. Supp. 3d 168, 196 (D. Mass. 2026) (final agency action where DHS policy "has immediate legal consequences for the affected students"). In light of the established "pragmatic

approach . . . to finality," SEVP cannot escape judicial review under the APA simply by including these disclaimers. *Hawkes Co.*, 578 U.S. at 599 (quotation marks omitted). The broadcasts dictate how SEVP's employees will interpret the governing regulation and affect the rights of the plaintiffs' members. Both broadcasts are thus final agency actions subject to APA review.

B. Arbitrary and Capricious.

On the merits, the plaintiffs first contend that they are likely to succeed on their claim that the Broadcast Messages are arbitrary and capricious because SEVP did not acknowledge or explain its change in policy, and did not consider the reliance interests of those affected by the change. The APA authorizes courts to "hold unlawful and set aside" final agency actions found to be arbitrary and capricious. 5 U.S.C. § 706(2)(A). Under the "change-in-position doctrine" invoked here, "agencies are free to change their existing policies as long as they provide a reasoned explanation for the change, display awareness that they are changing position, and consider serious reliance interests." *FDA v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 568 (2025) (citation modified); *see Doe v. Noem*, 152 F.4th 272, 289 (1st Cir. 2025). This doctrine involves a two-part inquiry: (1) "whether an agency changed existing policy" and (2) if so, whether "the agency 'display[ed] awareness that it *is* changing position' and offer[ed] 'good reasons for the new policy.'" *Wages & White Lion*, 604 U.S. at 569-70 (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)). At step two, "the agency must 'be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.'" *Id.* at 570 (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221-22 (2016)). But the agency need not "show 'that the reasons for the new policy are *better* than the reasons for the old one'" or "'provide a more detailed justification than what would suffice for a new policy created on a blank slate.'" *Id.* (quoting *Fox Television*, 556 U.S. at 918).

The Broadcast Messages are likely arbitrary and capricious under the change-in-position doctrine. First, as discussed, the broadcasts reflect a fundamental departure from the government's decades-long interpretation of 8 C.F.R. § 214.2(f)(10)(i) to authorize both mandatory and optional for-credit CPT programs. INS stated in the 1991 final rule that a training program is an "integral part of an established curriculum," and therefore qualifies as CPT, if an F-1 student "participate[s] in any *required* curricular practical training as soon as school begins *or* in any *elective* curricular practical training after having been in status for nine months." 56 Fed. Reg. at 55,611 (emphases added). Thus, since 1991, the government has construed 8 C.F.R. § 214.2(f)(10)(i) to include training "where students are awarded academic credits," even if that training is not required of all students in a degree program. *Id.* In the decades that followed, the government repeatedly construed the CPT regulation in agency guidance to cover optional, not just required, for-credit training. *See supra* Part I. Yet thirty-five years after promulgation of 8 C.F.R. § 214.2(f)(10)(i), through the August 2026 Broadcast Messages, SEVP adopted a new interpretation of the regulation to exclude such elective training taken for credit.

Second, SEVP did not acknowledge any change in policy. Titled as a "Reminder," the August 12 broadcast ostensibly sought to "remin[d] all [DSOs] of their responsibilities regarding [CPT] authorization." ECF 1-1, at 1 (bold omitted). But that broadcast did not address the 1991 rulemaking or prior agency guidance treating for-credit elective training as CPT. Nor did the August 24 broadcast. The government argues that the broadcasts "do not make a *genuine* change in position" because they "merely implement the *correct* reading of the existing regulation." ECF 27, at 18 (emphases added). Correct or not, this new interpretation is inconsistent with the government's previous position—what it now calls plaintiffs' "more liberal regulatory reading"—on CPT for elective training taken for academic credit. *Id.* at 17; *see DHS v. Regents of the Univ.*

*of California*, 591 U.S. 1, 33 (2020) (DHS had to justify its decision and consider alternatives even if it deemed its prior action "illegal"). And neither the government nor the broadcasts recognize that inconsistency. *See Encino Motorcars*, 579 U.S. at 222 ("[A]n unexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice." (citation modified)). By not "display[ing] awareness that it is changing position," SEVP also necessarily failed to articulate any "good reasons for the new policy." *Id.* at 221 (quotation marks omitted).[3]

Nor did SEVP consider the serious reliance interests of SEVP-certified institutions and the students they serve. When adopting a new position, an agency is "required to assess whether there were reliance interests" in the prior position, "determine whether they were significant, and weigh any such interests against competing policy concerns." *Regents*, 591 U.S. at 33. The agency must further "consider the alternatives that are within the ambit of the existing position." *Id.* at 30 (citation modified); *see Housatonic River*, 75 F.4th at 270. SEVP did not do so when it promulgated its broadcasts. Institutions relied on SEVP's prior regulatory interpretation to afford F-1 students "flexibility" in pursuing their varied career paths, ECF 8-6, ¶ 15; ECF 8-15, ¶ 16, and to "partne[r]" with external organizations that offer experiential training, ECF 8-13, ¶ 7. They crafted their curricula around SEVP's consistent representation that for-credit internships qualify as CPT, even if the internship was not required of all students in a degree program. *See* ECF 8-7,

[3] The government now attempts to justify SEVP's new regulatory interpretation by invoking a canon of statutory construction—reverse ejusdem generis—not mentioned in either Broadcast Message. ECF 27, at 18. The Court need not address, at this stage, whether this new argument may properly be raised in support of the broadcasts. In general, "judicial review of agency action is limited to the grounds that the agency invoked when it took the action." *Regents*, 591 U.S. at 20 (quotation marks omitted). And SEVP must generally "stand by the reasons it provided at the time of its decision and cannot rely on post-hoc rationalizations . . . presented during litigation." *Am. Hosp. Ass'n v. Kennedy*, 164 F.4th 28, 34 (1st Cir. 2026) (quotation marks omitted).

¶ 10; ECF 8-10, ¶¶ 8-13. F-1 students also chose an institution's program and paid for that program with the expectation that the institution could authorize CPT. *See* ECF 8-7, ¶ 11; ECF 8-10, ¶ 27. Some students even lost paid fall internships, *id.* ¶ 22, or financial support, ECF 8-7, ¶ 12, because of the new regulatory interpretation.

The government does not dispute that the broadcasts disregarded these reliance interests. Instead, it argues that institutions and students cannot reasonably rely on informal agency guidance. But the agency's comments regarding the 1991 final rule, which stated that CPT covered situations "where students are awarded academic credits," is not mere guidance. 56 Fed. Reg. at 55,611; *see Duke Energy Progress, LLC v. FERC*, 106 F.4th 1145, 1154 (D.C. Cir. 2024) ("Language in the preamble of a rule . . . can establish rights and obligations or create binding legal consequences[.]" (quotation marks omitted)). As for the other cited material, in *Regents*, the Supreme Court rejected a similar argument that DHS did not need to consider "potential reliance interests" simply because a legal memorandum stated, in pertinent part, that an agency program "'conferred no substantive rights.'" 591 U.S. at 30-31 (citations omitted). While "surely pertinent in considering the strength of any reliance interests," the Supreme Court explained, this feature did not "automatically preclude reliance interests" because reasoned decisionmaking still requires that such "consideration be undertaken by the agency in the first instance." *Id.* at 31. Recipients relied on the challenged program, that Court added, when they—like the F-1 students here—"enrolled in degree programs." *Id.* (quotation marks omitted). By ignoring institutions' and students' "decades of reliance" on its longstanding position treating elective for-credit courses as eligible for CPT, and failing to give reasons for or consider alternatives to its new policy, SEVP likely violated the change-in-position doctrine. *Wages & White Lion*, 604 U.S. at 585.

Accordingly, on the current record, the plaintiffs have demonstrated a substantial likelihood of success on their claim that the Broadcast Messages are arbitrary and capricious, in violation of the APA. Having so concluded, the Court need not consider the plaintiffs' other arguments as to why those broadcasts are arbitrary and capricious or their additional APA claims.

## III. **Irreparable Harm.**

Preliminary injunctive relief is available only where the moving party can "demonstrate that irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis omitted). Irreparable harm is "an injury that cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy." *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005). This harm is measured "on a sliding scale, working in conjunction with a moving party's likelihood of success on the merits, such that the strength of the showing necessary on irreparable harm depends in part on the degree of likelihood of success shown." *Braintree Lab'ys, Inc. v. Citigroup Glob. Markets Inc.*, 622 F.3d 36, 42-43 (1st Cir. 2010) (citation modified).

The plaintiffs have established that their members would suffer irreparable harm without an injunction. Institutions have already had to expend substantial resources to comply with the Broadcast Messages. Columbia University, for example, attests that it has "spent countless hours answering student questions about this change in CPT authorization" and modifying student curricula, and that the "volume of inquiry [from students] is not sustainable with [its] current staffing model." ECF 8-5, ¶ 7. Faculty and administrators at Washington University at St. Louis have similarly been "divert[ed] . . . from other academic, advising, and administrative responsibilities" so that they can "devote time to curriculum review and modification that otherwise would not have been necessary." ECF 8-14, ¶ 11. Such "unrecoverable costs" to

"overhaul" institutions' training programs, including "revis[ing] existing [student] guidance," qualify as irreparable harm. *Doe v. Trump*, 157 F.4th 36, 79 (1st Cir. 2025) (quotation marks omitted). The broadcasts also threaten institutions with the loss of SEVP certification for noncompliance and DSOs with criminal liability for making false statements. *See* ECF 18-4, ¶¶ 16-19. The loss of that certification, *President & Fellows of Harvard Coll. v. DHS*, 788 F. Supp. 3d 182, 210 (D. Mass. 2025), and "the threat of enforcement and the uncertainty that stems from that threat," *New York v. U.S. Dep't of Justice*, 804 F. Supp. 3d 294, 331 (D.R.I. 2025), likewise constitute irreparable injury.

The government characterizes these injuries as nothing "more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." *Nat'l Parks Conservation Ass'n v. U.S. Dep't of Interior*, 180 F.4th 348, 352 (1st Cir. 2026) (quotation marks omitted). That is so, it argues, because the plaintiffs' members can still authorize CPT for international students so long as they satisfy the requirements of 8 C.F.R. § 214.2(f)(10)(i). This argument is built on a faulty premise—namely, that the broadcasts merely articulate regulatory requirements and do not constitute a change in the SEVP's interpretation of the relevant regulatory requirements. As discussed, the broadcasts reflect an unexplained departure from the government's prior interpretation of 8 C.F.R. § 214.2(f)(10)(i), and its new interpretation rendered elective for-credit training ineligible for CPT. The fifteen submitted declarations sufficiently detail the concrete harms that the plaintiffs' members have experienced, and will continue to experience, as a result of SEVP's change in policy.

## IV. **Balance of Equities and Public Interest.**

The balance of equities considers "the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues." *Ross-Simons of Warwick, Inc. v. Baccarat,*

*Inc.*, 102 F.3d 12, 15 (1st Cir. 1996). Where, as here, the government is the nonmovant, the balance of the equities and public interest analyses merge. *Nken*, 556 U.S. at 435. The plaintiffs, as explained, have shown that their members are likely to face significant hardships without preliminary injunctive relief. They also argue that other organizations are likely harmed as well because students can no longer work at those organizations. *See, e.g.*, ECF 8-2, ¶ 20 (doctoral student unable to work as music director at church); ECF 8-4, ¶ 13 (law student unable to complete externship with federal judge).

The government retorts that these hardships are outweighed by SEVP's interests in overseeing and regulating F-1 students as well as issuing guidance on the regulatory requirements for DSOs and participating schools. But this response is premised on the government's misplaced theory that the broadcasts "merely remind the DSOs [when] CPT can be authorized." ECF 27, at 23. Since the broadcasts reflect a marked departure from SEVP's longstanding policy on elective for-credit training, the government offers no reason, let alone evidence, for why those same articulated interests would not be served by reverting to the prior policy for the plaintiffs and their members. Indeed, "there is generally no public interest in the perpetuation of unlawful agency action," but "a substantial public interest [exists] in having governmental agencies abide by the federal laws that govern their existence and operations." *Somerville Pub. Schs. v. McMahon*, 139 F.4th 63, 76 (1st Cir. 2025) (quotation marks omitted). Any harm that the government may experience from not being able to enforce the broadcasts is therefore outweighed by the harm to the plaintiffs and their members absent injunctive relief.

In sum, the plaintiffs have established that they are likely to succeed the merits of their claim that the Broadcast Messages are arbitrary and capricious, that irreparable harm will ensue if

the broadcasts continue to be enforced, and that the balance of the equities and the public interest favor issuance of a preliminary injunction. They are therefore entitled to a preliminary injunction.

**V. Scope of Relief.**

The plaintiffs seek two forms of interim equitable relief: a stay of agency action under 5 U.S.C. § 705 and a preliminary injunction as to them and their members under Federal Rule of Civil Procedure 65(a). The government does not contest the scope of the relief requested. But the Court has an independent obligation to ensure that the requested stay and preliminary injunction are appropriately tailored. *See Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (An "injunction [should be] no broader than necessary to achieve its desired goals.").

Staying enforcement or application of the August 2026 Broadcast Messages pursuant to 5 U.S.C. § 705 is warranted. This statute allows courts to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings" in order "to prevent irreparable injury." 5 U.S.C. § 705. Because section 705 "operates only on the agency action itself," courts may issue relief that extends beyond "redressing party-specific harms." *Woonasquatucket River*, 186 F.4th at 52, 55. The plaintiffs here collectively represent hundreds of institutions and DSOs across the United States. To "preven[t] chaos and confusion that a party-specific order would inevitably generate," nationwide relief is appropriate. *Presidents' All. on Higher Educ. & Immigr.*, 2026 WL 2690098, at *23; *see Nken*, 556 U.S. at 428-29 (a stay "temporarily suspend[s] the source of the authority to act"). The plaintiffs' proposed order seeks to "postpon[e] the effective dates" of the two broadcasts. ECF 8-17, at 1. But since neither broadcast contains an effective date, the Court will instead stay enforcement or application of the broadcasts "to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705.

A preliminary injunction is also warranted. The plaintiffs' proposed order requests that the defendants: (1) be prohibited from enforcing the broadcasts' new interpretation of 8 C.F.R. § 214.2(f)(10)(i) as to them "and each of their members, employees, and students, both prospectively and with respect to conduct and approvals that occurred prior to the [b]roadcasts' issuance"; (2) "rescind any adverse action already taken in reliance on the [b]roadcasts"; and (3) "provide written notice of" this order to all SEVP-certified institutions. ECF 8-17, at 1-2. The first request is appropriate, especially given the government's misguided assertion that a stay "would do nothing to redress any purported injury" because the "regulation is clear." ECF 27, at 12; *see Doe*, 157 F.4th at 80 (preliminary injunction is not limited "to only the . . . members whom the organizations identified in seeking associational standing"). The latter two requests are not. The plaintiffs' opening and reply briefs do not mention, let alone justify, either request. And the third request is, improperly, untethered to the plaintiffs in this case. *See Trump v. CASA, Inc.*, 606 U.S. 831, 852 (2025) ("[T]he question . . . is whether an injunction will offer complete relief *to the plaintiffs before the court*."). As for the second request, the plaintiffs do not identify "any adverse action" that the defendants have actually taken that could be rescinded. At most, they have presented evidence that the federal government has started to implement the broadcasts' new CPT eligibility standard. *See* ECF 8-4, ¶ 20; ECF 8-15, Ex. A. But mere implementation of that standard does not, at least on this record, amount to an adverse action. Accordingly, a preliminary injunction will issue that includes the first request but excludes the latter two requests.

**CONCLUSIONS AND ORDERS**

For the foregoing reasons, the motion for a preliminary injunction and stay of agency action, ECF 8, is GRANTED, in accordance with the following order:

1. The plaintiffs' motion for a stay pursuant to 5 U.S.C. § 705 is GRANTED. SEVP's Broadcast Messages of August 12, 2026 and August 24, 2026 are STAYED, such that those broadcasts may not be enforced or applied pending judicial review.

2. The plaintiffs' motion for a preliminary injunction under Federal Rule Civil Procedure 65(a) is GRANTED. The defendants, as well as their agents and anyone acting in concert or participation with them, are ENJOINED from implementing, enforcing, or otherwise carrying out the interpretation of 8 C.F.R. § 214.2(f)(10)(i) set forth in SEVP's Broadcast Messages of August 12, 2026 and August 24, 2026 as to the plaintiffs and each of their members, including their members' employees and students, both prospectively and with respect to conduct and approvals that occurred prior to the issuance of those broadcasts.

3. No security under Federal Rule of Civil Procedure 65(c) is necessary or warranted in the circumstances of this case.

SO ORDERED.

/s/ Julia E. Kobick
JULIA E. KOBICK
UNITED STATES DISTRICT JUDGE

Dated: November 17, 2026